**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MUZAKKIR HOSSAIN and SHAKHAWAT HASSAN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MEDIASTAR LIMITED d/b/a CHORKI and TRANSCOM LIMITED,

Defendants.

Case No. 1:24-cv-01201-KPF-OTW

Hon. Katherine P. Failla

Hon. Ona T. Wang

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Dated: February 18, 2025

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS


INTRODUCTION .......... 1

I. PROCEDURAL BACKGROUND .......... 2

A. Chorki Chose to Default After Conferring With Plaintiffs for Three Months .......... 2

B. Defendants Used the Time To Move Their Digital Assets Overseas and Rebuild the Chorki Service to Comply With the VPPA .......... 4

II. DEFENDANTS' REMAINING U.S. ASSETS .......... 5

LEGAL STANDARD .......... 5

ARGUMENT .......... 7

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM .......... 7

II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT ISSUE A TEMPORARY RESTRAINING ORDER .......... 14

III. THE BALANCE OF THE EQUITIES FAVORS PLAINTIFFS .......... 15

IV. A TEMPORARY RESTRAINING ORDER IS IN THE PUBLIC'S INTEREST .......... 15

V. THE COURT MAY ISSUE AN ORDER OF ATTACHMENT .......... 16

VI. THE COURT MAY ISSUE AN ORDER OF RESTRAINT .......... 17

CONCLUSION .......... 18

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Basank v. Decker*,
449 F. Supp. 3d 205 (S.D.N.Y. 2020) ........ 6

*Brink's Home Sec., Inc. v. Rojas*,
2007 WL 9717420 (N.D. Tex. Aug. 6, 2007) ........ 10

*Burdette v. FuboTV Inc.*,
2024 WL 2831466 (N.D. Ill. June 4, 2024) ........ 9

*Cappello v. Walmart Inc.*,
2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) ........ 9

*CF 135 Flat LLC v. Triadou SPY N.A.*,
2016 WL 2349111 (S.D.N.Y. May 3, 2016) ........ 6

*CF 135 Flat LLC v. Triadou SPV N.A.*,
2016 WL 5945912 (S.D.N.Y. June 24, 2016) ........ 17

*Coley v. Vannguard Urb. Improvement Ass'n, Inc.*,
2016 WL 7217641 (E.D.N.Y. Dec. 13, 2016) ........ Passim

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ........ 7

*Gallegos v. Elite Model Mgmt. Corp.*,
1 Misc. 3d 200 (N.Y. Sup. Ct. 2003) ........ 18

*Golden v. NBCUniversal Media, LLC*,
2024 WL 4904676,n.2 (S.D.N.Y. Nov. 27, 2024) ........ 8

*Goldstein v. Hochul*,
2022 WL 20305832 (S.D.N.Y. Oct 3, 2022) ........ 1, 14

*Google LLC v. Saeed*,
2023 WL 3122179 (S.D.N.Y. Apr. 25, 2023) ........ 16

*Hoffman v. Blaski*,
363 U.S. 335 (1960) ........ 10

*In re Kaiser*,
722 F.2d 1574 (2d Cir. 1983) ........ 17

*Jackson v. Fandom, Inc.*,
2023 WL 4670285 (N.D. Cal. July 20, 2023) .......... 9

*JSC Foreign Economic Ass'n Technostroyexport v. International Development and Trade Services, Inc.*
306 F. Supp. 2d 482 (S.D.N.Y. Mar. 4, 2004) .......... 17

*Lamb v. Forbes Media LLC*,
2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023) .......... 7

*Leser v. U.S. Bank Nat'l Ass'n*,
2013 WL 867151 (E.D.N.Y. March 7, 2013) .......... 18

*MD Produce Corp. v. 231 Food Corp.*,
304 F.R.D. 107 (E.D.N.Y. 2014) .......... 11

*Mich. Motor Techs. v. Volkswagen Aktiengesellschaft*,
2020 WL 3893038 (E.D. Mich. July 10, 2020) .......... 11

*N. Atl. Operating Co., Inc. v. eBay Seller dealz_f0r_you*,
2017 WL 10841481 (E.D. Mich. May 3, 2017) .......... 2

*Natera, Inc. v. Bio-Reference Labs., Inc.*,
2016 WL 7192106 (S.D.N.Y. Dec. 10, 2016) .......... 14

*Phillip v. Fairfield Univ.*,
118 F.3d 131 (2d Cir. 1997) .......... 14

*Rancourt v. Meredith Corp.*,
2024 WL 381344 (D. Mass. Feb. 1, 2024) .......... 12

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
754 F. Supp. 616 (S.D.N.Y. 2010) .......... 14, 15

*Riot Games, Inc. v. Suga PTE, Ltd.*,
638 F. Supp. 3d 1102 (C.D. Cal. 2022) .......... 13, 14

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015) .......... 7

*Rogers v. Hartford Life and Accident Ins. Co.*,
167 F.3d 933 (5th Cir. 1999) .......... 10

*S.D. v. Hytto Ltd.*,
2019 WL 8333519 (N.D. Cal. May 15, 2019) .......... 12

*Salazar v. National Basketball Association*,
118 F.4th 533 (2d Cir. 2024) .......... 8, 10

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) .......... 6, 15

*Saunders v. Hearst Television, Inc.*,
711 F. Supp. 3d 24 (D. Mass. 2024) .......... 9

*SEB S.A. v. Montgomery Ward & Co., Inc.*,
77 F. Supp. 2d 399 (S.D.N.Y. 1999) .......... 16

*Sellers v. Bleacher Rep., Inc.*,
2023 WL 4850180 (N.D. Cal. July 28, 2023) .......... 8

*Sequa Capital Corp. v. Nave*,
921 F. Supp. 1072 (S.D.N.Y. 1996) .......... 17

*Somoza v. New York City Dept. of Educ.*,
2006 WL 1981758 (S.D.N.Y. July 10, 2006) .......... 6

*Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*,
563 F.3d 1285 (Fed. Cir. 2009) .......... 11

*Trio v. Turing Video, Inc.*,
2022 WL 4466050 (N.D. Ill. Sept. 26, 2022) .......... 12

*UMG Recordings, Inc. v. Kurbanov*,
963 F.3d 344 (4th Cir. 2020) .......... 12

*United States v. Hastie*,
854 F.3d 1298 (11th Cir. 2017) .......... 7

*WebZero, LLC v. ClicVU, Inc.*,
2008 WL 1734702 (C.D. Cal. Apr. 4, 2008) .......... 12

*Will Co. v. Lee*,
47 F.4th 917 (9th Cir. 2022) .......... 12, 13

*Williams v. Life Sav. and Loan*,
802 F.2d 1200 (10th Cir. 1986) .......... 10

**STATUTES**

18 U.S.C. § 2710(b)(2)(B)(i) ........ 5, 7, 8, 10

28 U.S.C. § 1331 ........ 10

**RULES**

CPLR § 5229 ........ 6, 7, 17

CPLR § 6201(3) ........ 6, 16, 17

CPLR § 6212(a) ........ 16, 17

Fed. R. Civ. P. 4(f)(2)(c)(ii) ........ 2

Fed. R. Civ. P. 4(k)(2) ........ 11

Fed. R. Civ. P. 12(h)(B)(i)-(ii) ........ 10

Fed. R. Civ. P. 64(a) ........ 6, 16, 17

Fed. R. Civ. P. 65(a) ........ 5

# INTRODUCTION

This motion seeks the Court's immediate action to prevent Defendants from moving their remaining U.S.-based assets overseas and out of the reach of the United States judicial system, thereby irreparably prejudicing Plaintiffs and putative class members. Judge Broderick explained that one of the quintessential "examples where TROs might be appropriate are property disputes where one party is likely to move the property outside of the state or country … making judicial ability to provide relief difficult, if not impossible." *Goldstein v. Hochul*, 2022 WL 20305832, at *2 (S.D.N.Y. Oct 3, 2022). That is the case here.

Defendants Transcom Limited and Mediastar Limited ("Defendants" or "Chorki", with use of the chorki.com website and associated iOS and Android mobile applications known as the "Chorki Streaming Service" collectively) are related entities in what they call "one of the most diversified and largest professionally managed business conglomerates in Bangladesh with a presence across 29 countries" and "10k+ employees."[1]

Despite repeated notice of these proceedings, Chorki's strategy to date has been to default and avoid participation in the hope that it can avoid enforcement of any judgment against its assets. To that end, Chorki took steps to update its website to come into VPPA compliance (which is a good thing) and to transfer its library of digital assets from servers in the United States to servers abroad (which is a bad thing).

Plaintiffs now move to prevent further steps to prevent Chorki from severing two remaining connections of its assets with the United States. First, the domain of Chorki's website, www.chorki.com, is hosted by a registrar in the United States. This is an asset that can later be seized to enforce a judgment in this action so long as it is not transferred abroad. Second, Chorki

[1] https://www.linkedin.com/company/transcom-limited/about/.

still uses American entities to process its subscription payments, including Apple, Google, PayPal, and Stripe. Plaintiffs therefore seek an order enjoining Chorki from switching payment processors, and requiring all funds processed through these U.S. entities for Chorki be stored in a bank account in the United States. Chorki's withdrawal or transfer of funds would only be permissible pending further order from this Court. *N. Atl. Operating Co., Inc. v. eBay Seller dealz_f0r_you*, No. 17-10964, 2017 WL 10841481, at *7 (E.D. Mich. May 3, 2017).

## I. PROCEDURAL BACKGROUND

### A. Chorki Chose to Default After Conferring With Plaintiffs for Three Months

On February 16, 2024, Plaintiffs filed the operative Complaint. ECF No. 1 ("Compl."). On March 1, 2024, and again on March 24, 2024, Plaintiffs attempted service on both Defendants through Fed. R. Civ. P. 4(f)(2)(c)(ii), and successfully served Defendant Transcom Limited on March 27, 2024. ECF Nos. 10-11, 12-13, 16. To properly serve Defendant Mediastar Limited, Plaintiffs petitioned the Court for and were granted leave to serve Defendant Mediastar Limited through alternate means. ECF Nos. 14-15, 17. On April 1, 2024, Plaintiffs successfully served Defendant Mediastar Limited through email service pursuant to the Court's March 27, 2024 Order. ECF No. 18.

Chorki reached out to Plaintiffs' counsel via email the day after being served to confirm receipt of service. *See* Kopel Decl. Ex. 1, email at 9:41 am from Asif ul Haque to Victoria Zhou. In that initial email, Chorki's Bangladeshi counsel, Mr. Asif-ul Haque, requested an extension so that Chorki could engage U.S. counsel. *See id.* Plaintiffs responded, acknowledging that they would consent to an extension, and asking how long would be sufficient. *Id.*, email on April 1 at 2:15 pm from Max Roberts to Asif-ul Haque. Because Plaintiffs did not hear back, on April 16, 2024, Plaintiffs' counsel again reached out to determine Chorki's status and whether an extension was still needed. *Id.*, email on Apr. 16, 2024 at 5:06pm from Victoria Zhou to Asif-ul Haque. By

April 21, 2024, after exchanging 6 emails, the Parties had decided to seek a sixty-day extension from the Court, which Plaintiffs later did and which the Court granted. ECF Nos. 19-20; *id.*, email on April 21, 2024 at 3:32 am from Asif-ul Haque to Victoria Zhou.

On or around June 2024, Mr. Haque informed Plaintiffs' counsel that they wanted to discuss a possible settlement "before engaging its attorneys in the USA." Kopel Decl. Ex. 1, email on June 1, 2024 at 7:53am from Asif-ul Haque to Victoria Zhou. Over the next two business days, Plaintiffs' counsel requested, set up, and called Defendants twice on the Whatsapp mobile application to discuss a possible settlement. *See id.*, emails on June 3, 2024, June 4, 2024, and June 22, 2024. The Whatsapp calls were unproductive at producing any material terms to a settlement and resulted in Defendants seeking a second extension of thirty days on June 22, 2024, "to obtain management approval" for a possible settlement with Plaintiffs, which Plaintiffs agreed to. *See id*., email on June 22, 2024 at 7:57 am from Asif-ul Haque to Yitzchak Kopel. In total, Defendants requested, and Plaintiffs consented to and sought Court approval for, two extensions totaling ninety days. *See* ECF Nos. 19-20, 21-22. On June 25, 2024, Chorki's counsel stated that it intended "to finalise the appointment of the USA attorney." *Id.* Ex. 2, Whatsapp message on June 25, 2024 at 5:04 am from Hamidul Mishbah to Yitzchak Kopel.

The last time that Plaintiffs heard from Mr. Haque was on July 16, 2024, six days *after* Defendants' twice-extended deadline to respond. *See* Kopel Decl. ¶ 4. Mr. Haque asked Plaintiffs' counsel to "[p]lease let us know if there is any update from the Court." *Id.* Ex. 1, email on July 16, 2024 at 4:38 am from Asif-ul Haque to Max Roberts. Plaintiffs responded informing Mr. Haque that Chorki was in default and that Plaintiffs intended to proceed with third-party discovery to eventually move for class certification. *See id.*, email on July 16, 2024 at 7:33 am from Yitzchak Kopel to Asif-ul Haque. Chorki never responded. *See* Kopel Decl.

¶ 4. Per the Court's Orders, Plaintiffs served on Defendants a copy of the July 16, 2024 Clerk's Certificate of Default, the Order granting Plaintiffs' request for third party discovery, and Plaintiffs letter motion seeking an extension of time to complete third party discovery. *See* Kopel Decl. Ex. 1, email on July 16, 2024 from Max Roberts to Asif-ul Haque, email on July 22, 2024 from Max Roberts to Asif-ul Haque, and email on November 13, 2024 from Victoria Zhou to Asif-ul Haque; ECF Nos. 3, 33, 37; Kopel Decl. Ex. 9.

### B. Defendants Used the Time To Move Their Digital Assets Overseas and Rebuild the Chorki Service to Comply With the VPPA

In or around November 2024, Plaintiffs' experts conducted an initial analysis of the location endpoints behind the Chorki Website and App ("Location Analysis"). *See* Kopel Decl. ¶ 13. This type of analysis could allow Plaintiffs to determine the approximate physical location(s) where the Chorki Streaming Service's video content—a form of digital asset—was located and set up to be distributed to U.S. subscribers. *Id.*

Plaintiffs concluded that, at least as of November 2024, Defendants hosted their video content through Viewlift—an American company—on servers located in the United States. *See* Kopel Decl. ¶ 14; *id.* Exs. 3-5. This suited Plaintiffs' original plan post certification and default judgment, to obtain appropriate Court orders and then pursue Chorki's digital assets via their accounts that were hosted through these U.S. companies on these U.S. servers. These assets could potentially be used to satisfy a future judgment in this case.

However, Chorki used this time to move its digital assets from U.S. video hosting companies and U.S. servers to foreign video hosting companies and foreign servers overseas; Chorki was also simultaneously rebuilding portions of its mobile applications and website to become VPPA compliant.

Around February 10, 2025, Plaintiffs' experts conducted a second analysis of the digital asset locations of the Chorki Streaming Service. *See* Kopel Decl. ¶¶ 15-16; *id.* Exs. 6, 7. This second analysis determined that between November 2024 and February 2025, Defendants removed all of the Chorki digital assets from U.S. servers and U.S. hosting companies. Instead, Defendants now use a new entity, Gotipath, to host its digital assets in Bangladesh. *See id.* Further, by February 2025, the Chorki Streaming Service's user interface now included new user consent measures that explicitly required Chorki subscribers to consent to Defendants' privacy disclosures under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq*. *Id.* ¶ 15.

## II. DEFENDANTS' REMAINING U.S. ASSETS

Plaintiffs' counsel's two analyses also showed that even after Defendants removed the Chorki Streaming Service's digital assets to be hosted on servers in Bangladesh, Defendants still retain select assets in the United States that could be used to satisfy a judgment in part. First, Defendants still process in-app payments from Android application users through the Google Play Store, which is owned and operated by Google LLC. Second, Defendants still process in-app payments from iOS application users through the iOS App Store, which is owned and operated by Apple Inc. Finally, Defendants still process online subscription payments from users through third-party payments processor Stripe, Inc., and at least through November 2024, were processing payments through Paypal Holdings, Inc. *See* Ex. 3. at Rows 65-70, 72-85; Ex. 6 at Rows 24-31.

## LEGAL STANDARD

In the Second Circuit, a court may issue a temporary restraining order pursuant to Fed. R. Civ. P. 65(a) if a plaintiff establishes "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

favor, and that an injunction is in the public interest." *Basank v. Decker*, 449 F. Supp. 3d 205, 210 (S.D.N.Y. 2020) (internal quotation marks and citation omitted). "The standard for a preliminary injunctin is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal citation and quotations omitted).

The showing of irreparable harm is perhaps the single most important prerequisite for a preliminary injunction. *CF 135 Flat LLC v. Triadou SPY N.A.*, 2016 WL 2349111, at *1 (S.D.N.Y. May 3, 2016) (internal quotation marks, citation, and alteration omitted). A temporary restraining order may be granted pending a hearing on the preliminary injunction if the movant faces immediate and irreparable injury or damage. *Somoza v. New York City Dept. of Educ.*, 2006 WL 1981758, *7 (S.D.N.Y. July 10, 2006).

Under Fed. R. Civ. P. 64(a), this Court may also issue an order of attachment in the same manner provided by the law of the state where the court is located. CPLR § 6201(3) provides that attachment may be granted to a plaintiff who has demanded a money judgment, when the defendant, "with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." CPLR § 6201(3). *Coley v. Vannguard Urb. Improvement Ass'n, Inc.*, 2016 WL 7217641, at *7 (E.D.N.Y. Dec. 13, 2016).

Fed. R. Civ. P. 64(a) further allows this Court to issue an order of restraint in accordance with New York State law. CPLR § 5229 provides that "[i]n any court, before a judgment is entered, upon motion of the party in whose favor a verdict or decision has been rendered, the trial judge may order examination of the adverse party and order him restrained with the same

effect as if a restraining order had been served upon him after judgment." CPLR § 5229. *Coley*, 2016 WL 7217641 at *6.

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM

The Video Privacy Protection Act ("VPPA") prohibits a "[a] video tape service provider [from] knowingly disclos[ing], to any person, personally identifiable information ["PII"] concerning any consumer." 18 U.S.C. § 2710(b)(1). Each of these elements is readily met here. As alleged in the Complaint—and based on pre-suit testing commissioned by Plaintiffs' counsel (Compl. ¶ 20)—Defendants disclosed their users' full names, e-mail addresses, and the titles of the videos they requested or obtained (in addition to other information) to a variety of third parties, including Meta, Google, ViewLift, and CleverTap. Compl. ¶¶ 25-27. Someone's name is "expressly included within the definition of PII, as is clear from the face of the VPPA." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 182 (S.D.N.Y. 2015). The same is obviously true of the specific title of the video, and e-mail addresses also qualify as PII. *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017); *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) (under Driver's Privacy Protection Act, "[e]mail addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

Defendants are also "video tape service providers." The Chorki platform is a streaming service for Bangladeshi movies and TV shows, and Defendants monetizes this library "with subscriptions." Compl. ¶¶ 11, 14. Defendants are thus "engaged in the business" of "delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4); *see also Lamb v. Forbes Media LLC*, 2023 WL 6318033, at *9 (S.D.N.Y. Sept. 28, 2023) ("The Plaintiffs allege that Forbes hosts and delivers thousands of videos, featuring them as standalone

content and embedding them into articles and that Forbes monetizes these videos. Therefore, Forbes comes within the VPPA's definition of a video tape service provider.") (cleaned up); *Sellers v. Bleacher Rep., Inc.*, 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023) (collecting cases in which courts have held "that websites that provide video content as well as other media content … are video tape service providers under the VPPA.").

Plaintiffs likewise allege they paid for access to the Chorki video library. Compl. ¶¶ 12, 103-104 (p. 51), 111-112 (p. 53).[2] This clearly comes within the definition of a "consumer." 18 U.S.C. § 2710(a)(1). But Plaintiffs also downloaded the Chorki App on their iPhones and exchanged their PII through the account creation process. Compl. ¶¶ 103 (p. 51), 111 (p. 53). This too renders Plaintiffs "consumers" of Defendants' Chorki service. *Salazar v. National Basketball Association*, 118 F.4th 533, 552 (2d Cir. 2024) (finding plaintiff was a "consumer" where "he gave the NBA valuable personal information in exchange for access to the online newsletter"); *Golden v. NBCUniversal Media, LLC*, 2024 WL 4904676, at *2 n.2 (S.D.N.Y. Nov. 27, 2024) ("Given the Circuit's conclusion that the exchange of personal information for access demonstrates, at the pleading stage, that one is a 'subscriber' under the VPPA, a mobile application would appear similarly to plead a 'subscriber' relationship.").

There is also no defense against Plaintiffs' claim. Prior to disclosing their PII (or since), Defendants did not procure Plaintiffs' consent "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(B)(i); *see also, e.g.*, Compl. ¶ 143 (p. 59). No court has ever held a generic privacy policy is sufficient to comply with this requirement. *See, e.g.*, *Cappello v. Walmart Inc.*, 2019 WL

[2] The numbering in Plaintiffs' Complaint accidentally restarts as of page 51. Thus, for any numbered paragraph between 103-145, Plaintiffs also provide the page number.

11687705, at *2 (N.D. Cal. Apr. 5, 2019) ("[T]he plain language of the VPPA does indeed require video tape service providers to (1) request consumers' consent to a privacy disclosure that addresses only the use of personally identifiable information connected with video purchases and no other privacy topic, and (2) obtain the act of consent separately from the consumer's agreement to the retailer's terms of use, general privacy policy, and the commercial terms of the purchase."). Likewise, the Complaint laboriously lays out how Plaintiffs' PII was disclosed to the various third parties for marketing, advertising and analytics. Compl. ¶¶ 125-149 (pp. 39-47). Courts have universally held that "[t]he alleged uses of the information here – 'marketing, advertising, and analytics' – do not fall within the [ordinary course of business] exception's narrow list of permissible uses." *Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24, 32 (D. Mass. 2024); *see also, e.g..*, *Burdette v. FuboTV Inc.*, 2024 WL 2831466, at *5 (N.D. Ill. June 4, 2024) ("As targeted marketing and advertising analytics have only ballooned in complexity and pervasiveness … 'order fulfillment' and 'request processing' cannot reasonably be synonymous with marketing activities."); *Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *5 (N.D. Cal. July 20, 2023) (finding disclosures to Meta "to collect analytical data about how users use its website and, in turn … target more specific ads to their users, which permits websites to increase profits" fell outside the ordinary course of business exception) (cleaned up).

At the February 12, 2025 pre-motion conference, counsel for Defendants raised three additional arguments: lack of subject matter jurisdiction, lack of personal jurisdiction, and *forum non conveniens*.[3] Each is without merit. *First*, it is black letter law in this Circuit that this Court has subject matter jurisdiction over Plaintiffs' VPPA claim. The VPPA is a federal statute, so this

[3] Plaintiffs are mindful that the parties were instructed to confer about Defendant's jurisdictional arguments prior to submission of briefing, but nonetheless provides this background so the Court can at least make any preliminary finding of jurisdiction necessary to enter the requested relief.

Court has jurisdiction pursuant to 28 U.S.C. § 1331. And the Second Circuit has held that a violation of the VPPA gives rise to an injury-in-fact sufficient to Article III standing. *See Salazar*, 118 F.4th at 544. Instead, Defendants contend the VPPA does not apply to foreign corporations. That is baseless. Nothing in the plain text of the VPPA limits its application to only domestic corporations, as opposed to foreign corporations that knowingly exploit the PII of United States residents. On the contrary, the VPPA applies broadly to *any* business "engaged in the business, in or affecting interstate *or foreign* commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4) (emphasis added). Thus, the plain language makes clear it applies as much to foreign corporations as domestic ones.

*Second*, Defendants were served with process *over a year ago* and deliberately failed to enter an appearance in this matter, much less timely respond to the Complaint. Statement of Facts, *supra*. By defaulting and therefore not filing a motion or responsive pleading, Defendants waived any defense as to venue or *forum non conveniens*. Fed. R. Civ. P. 12(h)(B)(i)-(ii); *see also*, *e.g.*, *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960) ("[A] defendant, properly served with process by a court having subject matter jurisdiction, waives venue by failing seasonably to assert it, or even simply by making default."); *Rogers v. Hartford Life and Accident Ins. Co.*, 167 F.3d 933, 942-43 (5th Cir. 1999) ("a defendant in default waives any objection to venue."); *Williams v. Life Sav. and Loan*, 802 F.2d 1200, 1202 (10th Cir. 1986) ("[I]f a party is in default by failing to appear or to file a responsive pleading, defects in venue are waived, a default judgment may be validly entered and the judgment cannot be attacked collaterally for improper venue."); *Brink's Home Sec., Inc. v. Rojas*, 2007 WL 9717420, at *2 (N.D. Tex. Aug. 6, 2007) (finding defendant waived *forum non conveniens* defense by defaulting). This is so *even if the Court vacates the entry of default* (which it should not do). *MD Produce Corp. v. 231 Food Corp.*, 304 F.R.D. 107, 108 (E.D.N.Y. 2014)

("The Defendants are not free of fault for their failure to appear, and, therefore, they are reinstated to this lawsuit on the condition that they have waived the defense of improper venue by failing to timely raise the issue in response to the complaint.").

*Finally*, this Court possesses specific personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(2). This rule "allows a court to exercise personal jurisdiction over a defendant if (1) the plaintiff's claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) the exercise of jurisdiction comports with due process." *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1293-94 (Fed. Cir. 2009). "The third requirement under Rule 4(k)(2)—the due process analysis—contemplates a defendant's contacts with the entire United States, as opposed to the state in which the district court sits." *Id.* at 1295. As to the first and second factor, Plaintiffs assert a federal VPPA claim, and Defendants are not subject to general personal jurisdiction in any particular state. *See Mich. Motor Techs. v. Volkswagen Aktiengesellschaft*, 2020 WL 3893038, at *5 (E.D. Mich. July 10, 2020) ("Because VWAG is not subject to the general jurisdiction of any state, [the] second criterion under Rule 4(k)(2) is satisfied.").

As to the third factor, Defendants have purposefully and substantially availed themselves of the United States market. There are at least [redacted] United States users of the Chorki video service, each of which pays for a subscription. *See* Kopel Decl. Ex. 8.[4] By virtue of this, Defendants have also derived substantial revenue from United States users. *See id.* (stating that iOS subscribers to Chorki paid a total of [redacted] through the App Store during the relevant

[4] This comes from the Chorki iOS mobile application alone from the period starting approximately February 16, 2022 to August 7, 2024. While these numbers alone are sufficient to establish jurisdiction, Plaintiffs have obtained documentation from other third parties (not included in this Motion) demonstrating that Chorki had an even larger U.S. subscriber base for the relevant time period.

time period).[5] United States traffic on the Chorki Website also represents "approximately 5.8% of unique Website visits" worldwide. Compl. ¶ 19. This is sufficient for jurisdiction. *See, e.g.*, *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 349 (4th Cir. 2020) (jurisdiction established where "nearly 500,000 (or about 2% of all domestic visitors) came from Virginia" and "about 95,000 (or about 2%) of 2conv's domestic visitors came from Virginia"); *WebZero, LLC v. ClicVU, Inc.*, 2008 WL 1734702, at *6 (C.D. Cal. Apr. 4, 2008) (same where "California residents have both bought and utilized services from ClicVU, given that 4.2% of its members list California billing addresses, and ClicVU has asserted that users with such billing addresses accounted for $1200 in sales in 2007"); *Trio v. Turing Video, Inc.*, 2022 WL 4466050, at *4 (N.D. Ill. Sept. 26, 2022) (same established where "Turing had at least 30 customers in Illinois during the relevant period"); *Rancourt v. Meredith Corp.*, 2024 WL 381344, at *1 (D. Mass. Feb. 1, 2024) (same where "54,302, or 3% of the App's users in the United States, were located in Massachusetts"); *S.D. v. Hytto Ltd.*, 2019 WL 8333519, at *4 (N.D. Cal. May 15, 2019) ("By intercepting the transmissions of Body Chat app users, Hytto targeted its wrongful conduct at customers, some of whom Hytto knew, at least constructively, were residents of the U.S. Thus, the 'express aiming' requirement is satisfied.").

In addition, Defendants disclosed PII to United States businesses with whom it had agreements—Meta, Google, ViewLift, and CleverTap—and did so to specifically target and advertise to United States users. Compl. ¶¶ 125-149 (pp. 39-47); *see also Will Co. v. Lee*, 47 F.4th 917, 924 (9th Cir. 2022) ("[T]he advertising structure Defendants employed demonstrated that they profited from viewers in the United States market."); *UMG Recordings*, 963 F.3d at 354 ("Kurbanov knew the Websites were serving Virginian visitors and yet took no actions to limit or

[5] Excludes refunds.

block access, all while profiting from the data harvested from the same visitors"). Prior to deliberately moving its assets to avoid judgment, Defendants' library of video content was hosted in the United States. *See* Kopel Decl. Exs. 3-5; *see also Will Co.*, 47 F.4th at 924 (finding jurisdiction where "Defendants chose to host the website in Utah and to purchase content delivery network services for North America"). And, Chorki purposely used of Content Delivery Networks ("CDNs") in the U.S. in order to "reduce[] the time it takes for the site to load in the United States." *Will Co.*, 47 F.4th at 924; *see also Riot Games, Inc. v. Suga PTE, Ltd.*, 638 F. Supp. 3d 1102, 1115 (C.D. Cal. 2022) (finding jurisdiction where defendant "purchased and/or leased U.S.-based servers to host I Am Hero"); *see* Kopel Decl. Ex. 6 at Rows 24, 31-33. "This is good evidence that [Defendants] were motivated to appeal to viewers in the United States more than any other geographical location." *Will Co.*, 47 F.4th at 924. Chorki's moves to update its website to come into VPPA compliance further display the importance of the American market to the service.

This was no accident either: Defendants offered United States-specific discounts and even branded those discounts with the American flag and Statue of Liberty:



Compl. ¶ 17; *see also Riot Games, Inc.*, 638 F. Supp. 3d at 1115 (finding jurisdiction where defendant "advertised and marketed I Am Hero directly to United States-based consumers by using content written in English, launching promotional campaigns aligned with United States-recognized holidays, advertised in-game purchase prices with American dollars, and partnered with at least one American streamer to expose the game to potential American buyers").

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT ISSUE A TEMPORARY RESTRAINING ORDER

An injunction is necessary to prevent irreparable harm to Plaintiffs. *See Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997) (requiring movant to demonstrate "that the injunction is necessary to prevent irreparable harm"). Wherever the threatened harm "cannot be adequately redressed by final relief on the merits," irreparable harm exists. *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 616, 621 (S.D.N.Y. 2010).

Plaintiffs are likely to suffer irreparable harm in the absence of an injunction. The harm in this instance has two elements. The first element is that Chorki will transfer its URL domain to a foreign registrar. The second element is that payments deposited abroad, rather than through US-based platforms like Google, Apple, or Stripe into US bank accounts will not be traceable by Plaintiffs and will not fall under the aegis of this Court. These harms are irreparable because once Chorki's content has been moved to servers abroad, or payments cease to be deposited within the United States, Plaintiffs' ability to evaluate its claims will be diminished, perhaps completely. *See Goldstein*, 2022 WL 20305832 at *2 ("Other examples where TROs might be appropriate are property disputes *where one party is likely to move the property outside of the state or country, or transfer it to a third-party, making judicial ability to provide relief difficult, if not impossible*") (emphasis added). It is an "actual and imminent harm" because Chorki's secreting of information and assets is ongoing. *See Natera, Inc. v. Bio-Reference Labs., Inc.*,

2016 WL 7192106, at *2 (S.D.N.Y. Dec. 10, 2016). Plaintiffs' claims under the VPPA constitute a legal privacy interest under *Salinger* sufficient to establish irreparable injury.

The harm would be irremediable after adjudication because the basis of such an adjudication would be undermined by Chorki's transfers these assets to another country, where enforcement will be difficult, if not impossible. *Salinger*, 607 F.3d at 81. If Plaintiffs cannot gain access to these assets, their claims "cannot be adequately redressed by final relief on the merits." *Rex Med. L.P.*, 754 F. Supp. at 621.

## III. THE BALANCE OF THE EQUITIES FAVORS PLAINTIFFS

Chorki has no countervailing interest that tips the balance of the equities in its favor. The temporary restraining order would only keep some of Chorki's assets in the United States, where it had been located until the present, and oblige Chorki to continue using U.S.-based services like Google, Apple, or Stripe and use U.S.-based bank accounts. This is necessary given Chorki's prior conduct, as detailed above. Chorki would not have undertaken its present actions in the absence of this litigation pending against it. As such, Plaintiffs seek maintenance of the *status quo ante* and the balance of equities tips decidedly in Plaintiffs' favor.

Chorki will not suffer harm by keeping the URL domain in the United States where it has been and continues to be located. Moreover, Chorki will suffer no harm from continuing to use U.S.-based services such as Google, Apple, PayPal, or Stripe for its payments and depositing funds into U.S.-based bank accounts. *Cf. Salinger*, 607 F.3d at 82 ("by anchoring the injunction standard to equitable principles, albeit with one eye on historical tendencies, courts are able to keep pace with innovation in this rapidly changing technological area").

## IV. A TEMPORARY RESTRAINING ORDER IS IN THE PUBLIC'S INTEREST

Finally, the public interest would be served if this Court grants a preliminary injunction here. The sole purpose of Chorki's transfer of its assets abroad is to avoid enforcement of laws

such as the VPPA against it. *Cf. Google LLC v. Saeed*, 2023 WL 3122179, at *4 (S.D.N.Y. Apr. 25, 2023) ("the public interest is clearly served by enforcing statutes designed to protect the public, such as RICO, the CFAA, and the Lanham Act"). With every day that passes, Chorki can transfer more of its assets outside of the United States. *See id.* ("Every day that passes, the Defendants infect new computers, steal more account information, and deceive more unsuspecting victims"). Moreover, the "public interest favors an injunction" where, as here, one is necessary to maintain the *status quo* between the parties until a determination on the merits is made, no critical public interest would be harmed by its issuance, and the enjoined party can be effectively vindicated after a trial on the merits. *SEB S.A. v. Montgomery Ward & Co., Inc.*, 77 F. Supp. 2d 399, 405 (S.D.N.Y. 1999).

## V. THE COURT MAY ISSUE AN ORDER OF ATTACHMENT

An order of attachment of Chorki's assets is warranted under Fed. R. Civ. P. 64(a). That rule permits this Court to issue an order of attachment in the same manner provided by the law of the state where the court is located. Fed. R. Civ. P. 64(a). New York State law provides that attachment may be granted to a plaintiff who has demanded a money judgment, when the defendant, "with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." CPLR § 6201(3); *Coley*, 2016 WL 7217641 at *7. To obtain an attachment under CPLR § 6201(3), a plaintiff must also meet the requirements of CPLR § 6212(a), demonstrating that there is a cause of action, that it is probable that the plaintiff will succeed on the merits ... and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff. *Id.* (internal citation omitted).

Each of these elements is satisfied here. The Second Circuit has identified "badges of fraud," that include "the existence or cumulative effect of a … course of conduct after the …

pendency or threat of suits by creditors" and "the general chronology of the events and transactions under inquiry." *CF 135 Flat LLC v. Triadou SPV N.A.*, 2016 WL 5945912, at *10 (S.D.N.Y. June 24, 2016) (quoting *In re Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983)). Chorki's secreting of its assets abroad following the initiation of this lawsuit is sufficient evidence to find fraudulent intent. Moreover, the facts in this case are analogous to those in *JSC Foreign Economic Ass'n Technostroyexport*, 306 F. Supp. 2d at 487-88. There, the Court found evidence of fraudulent intent based on sales of property that closed after the filing of that action. Chorki's actions would further frustrate the enforcement of any judgment this Court might render in Plaintiffs' favor under CPLR § 6201(3) because enforcement of a judgment as to servers, payment processors, and bank accounts abroad will be impossible. Finally, Plaintiffs meet the requirements of CPLR § 6212(a) because there is no dispute that a cause of action exists, Plaintiffs have demonstrated that they will succeed on the merits in Section I above, and no counterclaims by Chorki exist.

## VI. THE COURT MAY ISSUE AN ORDER OF RESTRAINT

An order of restraint as to Chorki's assets is warranted under Fed. R. Civ. P. 64(a). The rule authorizes the court to grant certain provisional remedies in accordance with New York State law. *Coley*, 2016 WL 7217641 at *6. CPLR § 5229 provides that "[i]n any court, before a judgment is entered, upon motion of the party in whose favor a verdict or decision has been rendered, the trial judge may order examination of the adverse party and order him restrained with the same effect as if a restraining order had been served upon him after judgment." CPLR § 5229. Courts may order an adverse party restrained until judgment is entered where there is a danger that he will dispose of his assets. *Sequa Capital Corp. v. Nave*, 921 F. Supp. 1072, 1076 (S.D.N.Y. 1996). The moving party need not make a particular showing of the danger of dissipation of assets. *See Leser v. U.S. Bank Nat'l Ass'n*, 2013 WL 867151, at *3 (E.D.N.Y.

March 7, 2013); *Gallegos v. Elite Model Mgmt. Corp.*, 1 Misc. 3d 200, 207 (N.Y. Sup. Ct. 2003) (finding no requirement that the prevailing party "submit evidence that assets are definitively being disposed of or diverted as a prerequisite to obtaining injunctive relief"). As in *Coley*, Plaintiffs have obtained a default judgment against Chorki, but no final damages award has been entered against them. 2016 WL 7217641 at *6. Because Chorki has defaulted and because they are secreting assets abroad, the Court should issue an order of restraint here.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction and requests for an order of attachment and an order of restraint should be granted.

Dated: February 18, 2025

Respectfully submitted,

By: */s/ Yitzchak Kopel*
Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiffs*

**RULE 4(B) CERTIFICATION**

I, Yitzchak Kopel, certify that I prepared this memorandum of law and that this memorandum complies with Rule 4(B) of Judge Failla's Individual Rules of Practice in Civil Cases. According to the word processor used to prepare this memorandum, this memorandum contains 5,670 words and spans 18 pages.

________________________
Yitzchak Kopel