UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

MUZAKKIR HOSSAIN and SHAKHAWAT
HASSAN, *individually and on behalf of all
others similarly situated,*

                              Plaintiffs,

                    -v.-

MEDIASTAR LIMITED, *doing business as*
CHORKI, and TRANSCOM LIMITED,

                              Defendants.

———————————————————————

24 Civ. 1201 (KPF)

**ORDER**

KATHERINE POLK FAILLA, District Judge:

This Order resolves certain disputes between the parties concerning the

Court's prior grant of preliminary injunctive relief.  A complete understanding

of the issues in dispute requires a recapitulation of the prior procedural history

of this case.  On February 16, 2024, Plaintiffs Muzakkir Hossain and

Shakhawat Hassan (collectively, "Plaintiffs") filed a class action complaint

against Defendants Mediastar Limited d/b/a Chorki ("Chorki") and Transcom

Limited ("Transcom") (collectively, "Defendants"), alleging violations of the Video

Privacy Protection Act (the "VPPA"), 18 U.S.C. § 2710.  (*See, e.g.*, Dkt. #1 at 4-

6, 61-63).[1]  Defendant Transcom was served in March 2024, and Defendant

Chorki was served in April 2024.  (Dkt. #16, 18).  Thereafter, Plaintiffs filed two

joint requests for an extension of Defendants' time to answer, move, or

---

[1]    References to page numbers in this Order reflect the numbers assigned by this Court's
electronic case filing ("ECF") system.

otherwise respond to the complaint, the first on April 22, 2024, and the second on June 26, 2024. (Dkt. #19, 21).

On July 11, 2024, Plaintiffs requested certificates of default as to the two Defendants, noting that neither had appeared in the case. (Dkt. #23-25). The Clerk's Office issued certificates of default on July 16, 2024. (Dkt. #30-31). Three days later, on July 19, 2024, Plaintiffs moved before this Court for "discovery from third parties to ascertain the size of the proposed class and prove the elements of their VPPA claim" (Dkt. #32), which motion the Court granted on July 22, 2024 (Dkt. #33). In November 2024, Plaintiffs sought and obtained an extension of this discovery schedule (Dkt. #36-37), and on February 3, 2025, the Court scheduled a pre-motion conference to take place on February 12, 2025, to discuss Plaintiffs' contemplated motions for class certification and default judgment (Dkt. #39).

On February 10, 2025, new counsel for Defendants filed a motion for leave to appear *pro hac vice*, which motion the Court granted the following day. (Dkt. #40-41). At the conference on February 12, 2025, counsel for Plaintiffs related that prior counsel for Defendants had, while claiming to participate in good-faith negotiations with Plaintiffs' counsel, in fact provided cover for Defendants to transfer assets from the United States. Counsel for Defendants countered that this Court lacked subject matter and/or personal jurisdiction over Defendants. At the end of the conference, the Court ordered the parties to submit a joint status letter on or before February 21, 2025. (Minute Entry for February 12, 2025).

On February 18, 2025, Plaintiffs filed a motion for a temporary restraining order and a preliminary injunction. (Dkt. #43-48). In broad summary, Plaintiffs alleged that Defendants, while ostensibly taking steps to bring the Chorki website into compliance with the VPPA, had simultaneously been transferring their digital assets from servers in the United States to servers abroad. (Dkt. #44 at 1). In consequence, Plaintiffs requested "an order enjoining Chorki from switching payment processors, and requiring all funds processed through these U.S. entities for Chorki be stored in a bank account in the United States," such that "Chorki's withdrawal or transfer of funds would only be permissible pending further order from this Court." (*Id.* at 6). The following day, on February 19, 2025, the Court ordered the parties to appear for a telephonic conference on Plaintiffs' motion. (Dkt. #49).

According to the Court's notes of the February 19, 2025 conference, defense counsel previewed a motion to dismiss that he sought to file, and also attempted to provide a benign explanation for Chorki's recent transfer of assets outside of the U.S. At the end of the conference, the Court granted in part and denied in part Plaintiffs' request for injunctive relief. (Minute Entry for February 19, 2025). The following day, the Court issued an order to show cause why injunctive relief should not issue and, in the interim, temporarily restrained and enjoined Defendants, and any of their affiliates or others acting in concert with them, from:

> (i) moving the chorki.com web domain outside of the United States, either through switching its domain proxy registrar from a United States entity to a foreign registrar or otherwise, and

3

(ii)    switching the current third-party payment processors for the chorki.com website and Android and iOS mobile applications from payment processors in the United States to foreign companies, and

(iii)    depositing funds processed by payment processors in the United States on the Chorki Website and/or mobile applications into any account located outside of the United States.

(Dkt. #51 at 1-2). After hearing from the parties, the Court set schedules for briefing on Defendants' motion to dismiss and for jurisdictional discovery, and adjourned the hearing on Plaintiffs' motion for a preliminary injunction to March 17, 2025. (Dkt. #56, 58).

At the March 17, 2025 hearing, counsel for Plaintiffs advised the Court that while Defendants had complied with the first and second prongs of the Court's February 20, 2025 order, "no affirmative steps have been taken to come into compliance with the third provision as of yet." (Dkt. #59 (transcript of March 17, 2025 conference ("March 17 Tr.")) at 5). The parties spent much of the hearing disputing the number of Chorki subscribers in the U.S., with Plaintiffs arguing for 13,000 subscribers and $300,000 to $400,000 in revenue via Apple alone, and Defendants arguing for only 3,352 subscribers in the U.S. via all platforms. (*Id.* at 7, 14-17). Plaintiffs renewed an earlier application for attachment, arguing in particular that "without the remedy of attachments, there is a high likelihood that we will not be able to enforce a judgment for members at all." (*Id.* at 9). Defendants rejoined that injunctive relief should not be continued until jurisdictional discovery was completed (*id.* at 18), and, further, that injunctive relief was not warranted because Defendants "have

4

no[ ] intention of moving any of these things from the United States" (*id.* at 20).
After taking a break to consider the parties' arguments, the Court granted
Plaintiffs' request for a preliminary injunction.  (*Id.* at 29-31).  As with
Plaintiffs' request for a temporary restraining order, the Court restrained
Defendants' funds but did not attach them.  After the Court's decision was
issued, both sides sought clarification of it, culminating in the following
exchange with defense counsel:

> MR. MAHAJAN: So any money generating from the U.S.
> payment processing will go to U.S. bank account, and it
> will remain in the United States.  But they can use this
> money to pay something to Facebook if they need, to
> pay something to Google, they can do that?
>
> THE COURT: Yes.
>
> MR. MAHAJAN: The only thing they cannot do is take
> the money out of the United States?
>
> THE COURT: Yes.

(*Id.* at 33).

From the Court's perspective, the troubles began after the preliminary
injunction order was issued.  On March 31, 2025, Defendants moved for
reconsideration of the order on the grounds that the factual premises of the
Court's decision — which, it bears noting, were derived from defense counsel's
representations to the Court and his non-opposition to Plaintiffs' counsel's
representations — were flawed:

> The Order rests on factual misapprehension: that
> Chorki (1) operates in the U.S., (2) directly contracts
> with U.S. payment processors, and (3) maintains U.S.
> banking infrastructure to retain funds domestically.
> None of these assumptions are true.  As such, following

5

> the issuance of the Order, Chorki seeks to clarify key factual inaccuracies that fundamentally impact the feasibility of compliance. Contrary to the Court's premise, Chorki does not engage with U.S. payment processors directly, nor does it maintain any financial infrastructure i.e., bank accounts within the United States that would allow it to retain funds there. Rather, all payments from U.S. consumers are processed through PayPal India and Stripe India, which are subject to Indian financial regulations that mandate immediate fund transfers to an Indian (not U.S.) bank account. Thereafter, the funds are transferred to Chorki's designated bank account in Bangladesh, as neither PayPal nor Stripe operate in Bangladesh.

(Dkt. #61 at 2; *see also id.* at 3 ("The directive effectively requires Chorki to establish a U.S. business entity, open a U.S. bank account, and deposit all U.S.-generated revenue into that account, despite the fact that Chorki has no legal presence in the United States.")).

Plaintiffs vigorously opposed Defendants' motion, noting among other things that (i) Defendants had submitted no evidence supporting their arguments for reconsideration; (ii) Defendants had waived these arguments based on their prior factual representations to the Court; (iii) the Court could continue to restrict the deposit of payments into U.S.-based bank accounts; and (iv) the Court's order contemplated Defendants' having (or establishing) U.S.-based bank accounts. (Dkt. #62) By Order dated May 6, 2025, the Court denied Defendants' motion for substantially the reasons cited by Plaintiffs: "While Defendants now claim that they do not contract with U.S. payment processors such that they cannot comply with the third component of the preliminary injunction, the Court agrees with Plaintiffs that Defendants have (i) provided no evidence to support these assertions; and (ii) failed to explain

6

why they failed to raise these purported issues at the hearing." (Dkt. #64 at 1-2 (internal citation omitted)).

Things only worsened from there, as the parties came to the end of the period specified by the Court for jurisdictional discovery. The Court granted Plaintiffs' request for an extension of the deadline, so that Defendants could respond to Plaintiffs' discovery requests. (Dkt. #66). The parties then filed cross-motions, Defendants for a order compelling production and Plaintiffs for an order of contempt. (Dkt. #67-69). The Court held a conference to discuss the parties' motions on July 9, 2025. (Dkt. #71 (scheduling conference), 72 (transcript of July 9, 2025 conference ("July 9 Tr."))).

The July 9, 2025 conference began with the Court recounting the procedural history of the case since defense counsel's entry of a notice of appearance, and reminding defense counsel that his clients were still in default. (July 9 Tr. 3-5). The Court then proceeded to discuss with the parties the results of jurisdictional discovery. Defense counsel argued that the only U.S. viewers who mattered for Rule 12(b)(2) purposes were those who "had subscribed to Chorki as a result of targeted marketing by" Defendants, which counsel numbered at approximately 60. (*Id.* at 7; *see also id.* at 8-10 (Plaintiffs' counsel stating that Defendants' production disclosed 35 subscribers, but that prior productions from Apple had disclosed 13,209 subscribers); *id.* at 36-39 (Plaintiffs' counsel stating that the results of subpoenas to third parties suggested "close[ ] to" 20,000 subscribers in the U.S.)). Later, in response to Court questioning, defense counsel supplemented his response by citing the

7

approximately 3,500 Chorki subscribers who had provided U.S. addresses. (*Id.* at 22). The Court reiterated that Defendants remained in default; that it would schedule dispositive motion practice at Defendants' request; but that the jurisdictional evidence presented to the Court did not suggest a successful Rule 12(b)(2) motion. (*Id.* at 26-27, 29-33; *see also id.* at 33-41 (scheduling motion practice)).

After the jurisdictional issues were discussed, counsel for Defendants abruptly announced that Defendants were "unable to follow" the Court's injunctive orders. (July 9 Tr. 41). Counsel explained that "there was no money in the U.S., and defendant[s] did not move any money from" the U.S. (*Id.* at 42). This new information both surprised and disturbed the Court, which noted that the injunctive relief it had issued had been predicated on counsel's representations that Defendants had money in the U.S. (in Stripe and Paypal accounts) that they would not move. (*Id.* at 42-43, 46; *see also id.* at 50 ("[R]ight now, your client is in contempt, and telling me that your client can't do this — I don't have enough of an evidentiary basis to accept your representation to me that your client cannot segregate funds.")). Defense counsel offered Google as an example, and explained that monies collected for Defendants through Google were deposited in a Bangladeshi bank account. (*Id.* at 44; *see also id.* at 45 (discussing Apple and Paypal)). Plaintiffs' counsel also expressed surprise, noting that the payment processors to which they had reached out were in fact trying to comply with the Court's injunctive order. In particular, Plaintiffs' counsel related that funds were still being processed by

U.S. payment processors and, pursuant to the Court's order, such funds should not be leaving the U.S.; Plaintiffs' counsel suggested that the funds be directed to a third-party account, such as a Court or attorney escrow account. (*Id.* at 48). At that point, the Court suggested that Defendants might be able to post a bond, though this alternative was discussed in broad terms and not specific amounts. (*Id.* at 49). As the hearing ended, the Court directed the parties to file supplemental submissions regarding the purported inability of Defendants' payment processors to comply with the Court's orders, as well as the possibility of a bond. (*Id.* at 50).

The parties submitted their supplemental briefing on July 18, 2025. (Dkt. #74 (Defendants), 75 (Plaintiffs)). Defendants submitted two unsworn statements from Department Lead Taposh Barmon of Chorki's Digital Product & Technology Department. (Dkt. #74). In the first, Barmon stated that both the payment processors and local counsel had advised Defendants that funds generated from U.S. transactions could not be sent to a U.S. bank account because (i) Chorki was not registered to do business in the U.S. and (ii) Bangladeshi law forbade such transfers. (*Id.* at 3-4). In the second, Barmon stated that Chorki "has a total of 3,255 paid subscribers across its platform from the U.S.," based on "successful payment transactions processed through third-party payment gateways." (*Id.* at 5).[2]

---

[2]    At a subsequent hearing held on August 7, 2025, Defendants updated that figure to 5,055 subscribers in the U.S. (*See* transcript of August 7, 2025 conference ("August 7 Tr.") at 15-16).

Plaintiffs spent the first half of their supplemental submission attempting to refute Defendants' arguments for non-compliance. (Dkt. #75). Beginning with Defendants' arguments regarding segregation, Plaintiffs explained that the arguments proceeded from a false premise, *viz.*, that "the Court's order applied solely to funds originating from consumers in the United States but not to funds that were paid from elsewhere," when in fact the order pertained to all funds generated from U.S. payment processing. (*Id.* at 1-2).[3] As for Defendants' arguments concerning Google, Plaintiffs observed that Defendants could have opened a bank account in the U.S. (*Id.* at 2). Plaintiffs then pivoted to discuss information they had received from Defendants' payment processors regarding their respective compliance with the Court's injunctive order: "Of the four processors, (1) Stripe has frozen Defendants' accounts, (2) PayPal has taken no action because the processing occurs through its subsidiary, PayPal India, and therefore takes the position that it is not subject to the Court's Order, and (3) Apple and Google are still investigating the matter." (*Id.* at 2). Plaintiffs questioned the efficacy of a bond, though they agreed that the Court had the discretion to order one, and suggested instead that the Court appoint a receiver. (*Id.* at 4).

On July 30, 2025, the Court scheduled a conference to take place on August 7, 2025, to discuss these compliance issues. (Dkt. #78). The same day, counsel for Defendants filed a letter expressing their intent to move under

---

[3]    Defendants subsequently filed a letter requesting clarification of the Court's order on this point. (Dkt. #76).

Federal Rule of Civil Procedure 21 to drop "one improperly joined plaintiff, Shakhawat Hassan, and one improperly joined defendant, Transcom Limited." (Dkt. #77 at 1; *see also* Dkt. #80 (Plaintiffs' response to pre-motion letter)).  A few days later, on August 4, 2025, counsel for Defendants filed a letter attempting to explain away his multiple prior references to "U.S. bank accounts" that his clients maintained or could have maintained, and apologizing for the confusion he had sowed.  (Dkt. #79 at 2 (Defendants' counsel acknowledging using the term "bank account" multiple times during the March 17, 2025 hearing, and explaining to the Court for the first time that counsel had meant two different things: (i) a U.S.-based Paypal account, which counsel now says Defendants do not have; (ii) third-party payment processors, the funds from which counsel understood would be held in the U.S.).

The Court began the August 7, 2025 conference by obtaining updates from the parties.  Counsel for Defendants repeated his belief that the Court's order had been intended specifically to segregate funds from U.S.-based users, and not merely funds processed by U.S.-based payment processors.  (August 7 Tr. 4-5).  The Court promptly dispelled this misperception:

> What you agreed to do — and we talked about this.  It's at pages 45 and 46 of the transcript of the July hearing, you said to me, and on March 17th you had said to me — go back to pages 20 and 21 of the March 17th hearing, "Any money generat[ed] from the US payment processing will go to a US bank account and it will remain in the United States."
>
> Now, you may have thought that I was limiting it just to US users who were using US processing, but ... I actually went with what you said to me, which was any payments by the US payment processors.  So that was

> what you agreed to.  And that's what we talked about in
> July, that that's what you agreed to.

(*Id.* at 5-6).  Defense counsel also explained his understanding of why Defendants did not have, and could not have, a bank account in the U.S.  (*Id.* at 7-10).  Counsel for Plaintiffs, for their part, updated the Court on the payment processors' reactions to the Court's order, noting that Stripe and Apple were abiding by the Court's order and would not disburse funds they received into a non-U.S. bank account; that Paypal was taking the position that it was not bound by the order because the relevant entity was Paypal India; and that Google had not responded.  (*Id.* at 12).

From there, the parties discussed the bond alternative proposed by the Court at the July 9, 2025 conference.  Counsel for Plaintiffs argued that a bond would resolve certain of the issues raised by Defendants, but wondered whether Defendants would comply.  (August 7 Tr. 12-14).  Counsel for Defendants then made clear that Defendants would not, or could not, comply; he explained that Defendants would have to apply to the Central Bank in Bangladesh for permission before posting a bond, and that the wait for permission would be long.  (*Id.* at 14-20).

On August 21, 2025, both sides filed motions.  Defendants moved to drop certain parties from the litigation and to dismiss (Dkt. #82-83); those motions will be addressed in a subsequent order.  Plaintiffs moved for clarification of the Court's prior injunctive order as it applied to GoDaddy, Inc. ("GoDaddy"), the current U.S. registrar of Chorki's domain.  (Dkt. #81).

## DISCUSSION

As the parties are well aware, a movant seeking preliminary injunctive relief must show that (i) it is likely to succeed on the merits, (ii) it is likely to suffer irreparable harm in the absence of preliminary relief, (iii) the balance of equities tips in its favor, and (iv) an injunction is in the public interest. *Hudson Shore Assocs. Ltd. P'ship* v. *New York*, 139 F.4th 99, 106 (2d Cir. 2025). Of these four prerequisites, " '[t]he irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction' and 'must therefore be satisfied before the other requirements for an injunction can be considered.'" *St. Joseph's Hosp. Health Ctr.* v. *Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (quoting *State Farm Mut. Auto. Ins. Co.* v. *Tri-Borough NY Med. Practice P.C.*, 120 F.4th 59, 80 (2d Cir. 2024)). "To establish irreparable harm, the moving party must show an 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *Id.* (quoting *New York* v. *U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020)).

"[I]t is settled law that when an injury is compensable through money damages there is no irreparable harm," *Marblegate Asset Mgmt.* v. *Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 607 (S.D.N.Y. 2014) (alteration in original) (citation omitted), and, further, that monetary "compensation need only be 'adequate' for preliminary relief to be unwarranted, not perfect," *St. Joseph's Hosp. Health Ctr.*, 131 F.4th at 106 (quoting *Daileader* v. *Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 358 (2d Cir. 2024)). That said, and as a

13

sister court in this District recently recognized, there are circumstances in which "monetary harms can constitute irreparable harms, such as when a defendant is judgment-proof either because the defendant is or imminently will be insolvent or because the defendant has demonstrated an intent to frustrate any eventual judgment against it." *Pennantia, LLC* v. *Rose Cay Maritime*, No. 25 Civ. 5904 (SHS), 2025 WL 2388807, at *3 (S.D.N.Y. Aug. 18, 2025) (citing *Brenntag Int'l Chemicals, Inc.* v. *Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) ("[C]ourts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents."); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985) ("Even where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant intended to frustrate any judgment on the merits by transferring its assets out of the jurisdiction." (citation modified))).

The Court has already found that injunctive relief is warranted. To begin, considering the allegations set forth in the Complaint (as well as Defendants' merits-based responses to date), the Court believes that Plaintiffs have demonstrated a likelihood of success on the merits. That this factor favors Plaintiffs is further underscored by the fact that Defendants remain in default. More pointedly, Defendants' conduct in (i) moving digital assets from the U.S. during the pendency of the lawsuit, while their counsel purported to negotiate in good faith with Plaintiffs' counsel, and (ii) presenting shifting, inconsistent, and unsworn explanations to the Court regarding their assets in

the U.S. and abroad,[4] suffices to demonstrate irreparable harm; absent injunctive relief, Plaintiffs could very well end up with a substantial judgment and no means to enforce it. And on the current record, the remaining two factors, the balance of equities and the public interest, also favor Plaintiffs.

The question that remains concerns the appropriate mode of injunctive relief. Though the Court floated the idea of Defendants posting a bond, their counsel's statements at the August 7, 2025 hearing underscore the inutility of such a measure. As a result, the Court reaffirms the relief it ordered back in March: Defendants, and any of their affiliates or others acting in concert with them, are enjoined from:

> (i)    moving the chorki.com web domain outside of the United States, either through switching its domain proxy registrar from a United States entity to a foreign registrar or otherwise, and
>
> (ii)   switching the current third-party payment processors for the chorki.com website and Android and iOS mobile applications from payment processors in the United States to foreign companies, and
>
> (iii)  depositing funds processed by payment processors in the United States on the Chorki Website and/or mobile applications into any account located outside of the United States.

(Dkt. #51 at 1-2).

For avoidance of doubt, the Court means what it says: *any* funds processed by payment processors in the U.S. are to remain here, and are not to

---

[4]    Despite affording the defense numerous chances, the Court does not feel that, even today, it can accept defense counsel's factual representations concerning Chorki's current bank accounts and ability to obtain additional bank accounts.

be transferred outside of the U.S.  As a practical matter, this means that *all four payment processors* — and not just Stripe and Apple — should be segregating and withholding these funds, and should not be transferring them outside of the U.S.  The parties are further directed to meet and confer about the possibility of defense counsel setting up an attorney escrow account, into which these withheld funds could be deposited pending further order of the Court, and to advise the Court of the status of these discussions on or before **September 19, 2025**.  At this time, the Court will not appoint a receiver; however, depending on the results of the parties' discussions, and depending on the Court's resolution of Defendants' motions, Plaintiffs may be given leave to renew this motion.

Finally, the Court understands from Plaintiffs that GoDaddy requires specific direction from the Court regarding the first prong of the injunctive relief the Court ordered back in March 2025.  (Dkt. #81).  Having reviewed the parties' submissions (Dkt. #81, 84), the Court agrees that such relief is appropriate.  Accordingly, the Court orders GoDaddy to refrain from transferring away and/or relinquishing control over the domain name www.chorki.com until further order of the Court.

The Clerk of Court is directed to terminate the motion pending at docket entry 81.

SO ORDERED.

Dated:    September 5, 2025
          New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge