**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MUZAKKIR HOSSAIN and SHAKHAWAT HASSAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MEDIASTAR LIMITED d/b/a CHORKI and TRANSCOM LIMITED,<br><br>Defendants. | Case No. 1:24-cv-01201-KPF-OTW<br><br>Hon. Katherine P. Failla<br><br>Hon. Ona T. Wang |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AND MOTION TO DROP THE PARTIES**

Dated: September 12, 2025

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ....... 1

ARGUMENT ....... 2

I. THE COURT SHOULD *NOT* VACATE DEFENDANTS' DEFAULT ....... 2

A. Defendants' Default Was Willful ....... 3

B. Defendants Have Not Presented A Meritorious Defense ....... 5

C. Plainitffs Have Been Prejudiced By Defendants' Conduct ....... 5

II. DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED ....... 6

A. Plaintiffs Have Sufficently Pled A VPPA Claim ....... 6

B. The Court Denied Defendants' Motion To Compel Discovery And Plaintiffs Are Not Required To Prove Their Case At The Pleadings ....... 7

III. DEFENDANTS' MOTION TO DROP PARTIES SHOULD BE DENIED ....... 9

A. The Drop Motion Is Procedurally Deficient ....... 9

B. The Court Possesses Personal Jurisdiction Over Transcom, And Plaintiffs Have Set Forth A Valid Claim Against Transcom ....... 10

1. Defendants' "Evidence" Is Procedurally Defective ....... 10

2. Public Statements By Transcom's Management Shows It Is Intimately Involved With The Chorki Service ....... 12

C. Plaintiff Hassan Was A Chorki Subscriber ....... 16

CONCLUSION ....... 18

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Animaccord LTD. v. Individuals, Partnerships & Unincorp. Assocs. Identified on Schedule "A"*, 2023 WL 6206452 (E.D. Va. Feb. 28, 2023) .......... 9

*Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025) .......... 17

*Deajess Med. Imaging, P.C. v. Travelers Indem. Co.*, 222 F.R.D. 563 (S.D.N.Y. 2004) .......... 19

*Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154 (S.D.N.Y. 2009) .......... 19

*DiFolco v. MSNBC Cable LLC*, 622 F.3d 104 (2d Cir. 2010) .......... 9

*Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017) .......... 7

*Garner v. Behrman Brothers IV, LLC*, 260 F. Supp. 3d 369 (S.D.N.Y. 2017) .......... 9

*Gunnells v. Teutul*, 469 F. Supp. 3d 100 (S.D.N.Y. 2020) .......... 3, 5

*Hossain v. Mediastar Ltd. d/b/a Chorki*, 2025 WL 2578128 (S.D.N.Y. Sept. 5, 2025) .......... *Passim*

*Indus PVR LLC v. Maa-Sharda, Inc.*, 140 A.D.3d 1666 (4th Dep't 2016) .......... 8

*Jewell v. Music Lifeboat*, 254 F. Supp. 3d 410 (E.D.N.Y. 2017) .......... 19

*Kalie v. Bank of Am. Corp.*, 297 F.R.D. 552 (S.D.N.Y. 2013) .......... 19

*Lyons Partnership v. D&L Amusement & Entertainment, Inc.*, 702 F. Supp. 2d 104 (E.D.N.Y. 2010) .......... 2

*Salazar v. National Basketball Association*,
118 F.4th 533 (2d Cir. 2025) .......... 7

*Salazar v. Paramount Global*,
133 F.4th 642 (6th Cir. 2025) .......... 7

*Ugalde v. Dyncorp., Inc.*,
2000 WL 217502 (S.D.N.Y. Feb. 23, 2000) .......... 16

*UMG Recordings, Inc. v. Kurbanov*,
963 F.3d 344 (4th Cir. 2020) .......... 17

*Will Co. v. Lee*,
47 F.4th 917 (9th Cir. 2022) .......... 17

*Williams v. Smith*,
2020 WL 759684 (W.D.N.Y. Feb. 11, 2020) .......... 19

*Wyndham Associates v. Bintliff*,
398 F.2d 614 (2d Cir. 1968) .......... 19

**STATUTES**

18 U.S.C. § 2710(a)(1) .......... 18

**RULES**

Fed. R. Civ. P. 4(k)(2) .......... 17

Fed. R. Civ. P. 6(b)(1)(B) .......... 2

Fed. R. Civ. P. 12(b), (h) .......... 2, 10

Fed. R. Civ. P. 20(a)(1) .......... 18

Fed. R. Civ. P. 21 .......... 2, 9, 10

Fed. R. Civ. P. 37(b)(2)(ii) .......... 1, 12

Fed. R. Civ. P. 56(c)(4) .......... 11

Fed. R. Civ. P. 60(b)(1) .......... 2

**OTHER AUTHORITIES**

10A Fed. Prac. & Proc. Civ. § 2688.1 (4th ed.)........................................................................ 2

Plaintiffs Muzakkir Hossain and Shakhawat Hassan respectfully submit this Opposition to Defendants Mediastar Limited d/b/a Chorki ("Mediastar") and Transcom Limited's ("Transcom") (collectively, "Defendants") Motion to Dismiss the Complaint (ECF No. 83) (the "Dismissal Mtn.") and Motion to Drop the Parties (ECF No. 82) (the "Drop Mtn.") (the "Motions").

## INTRODUCTION

Despite contending for months that the scope of Chorki's subscriber base in the United States was insufficient to confer jurisdiction, Defendants have now abandoned any pretense of that argument. Instead, only Transcom argues the Court lacks personal jurisdiction over it because it allegedly was not involved in the Chorki Service. Defendants' "evidence" of this consists of nothing that was produced during jurisdictional discovery and is based on the declaration of the CEO of Mediastar, rather than someone at Transcom. This type of sandbagging should not be allowed. Fed. R. Civ. P. 37(b)(2)(ii). Regardless, public statements by Zaraif Hossain—"the Head of Strategy and Transformation at Transcom Ltd" and "the President and Head of Strategy for Chorki"—show that Chorki is a venture of Transcom that is 100% funded by Transcom and is backed by the employee and technical infrastructure of Transcom, with Transcom also having the final say in decision-making. Declaration of Yitzchak Kopel ("Kopel Decl.") Ex. 3. Far from having nothing to do with the Chorki Service, the minimum contacts with the United States that the Chorki Service creates (and which Defendants admit are sufficient for jurisdiction) can be imputed to Transcom as much as Mediastar.

Beyond this, Defendants' 12(b)(6) arguments are without merit, and Defendants' ongoing default precludes its argument that Plaintiff Hassan was never a Chorki subscriber (he was). *See* Declaration of Shakhawat Hassan ("Hassan Decl.") ¶¶ 2-4; *id.* Ex. 1. And this Court's September 5, 2025 Order lays bare why Defendants' conduct weighs against vacating the default—namely,

that the default was willful to "provide[] cover for Defendants to transfer assets from the United States." *Hossain v. Mediastar Ltd. d/b/a Chorki*, 2025 WL 2578128, at *1 (S.D.N.Y. Sept. 5, 2025); *see also id.* ("Plaintiffs alleged that Defendants, while ostensibly taking steps to bring the Chorki website into compliance with the VPPA, had simultaneously been transferring their digital assets from servers in the United States to servers abroad.").

For the following reasons, Defendants' Motions should be denied.

## ARGUMENT

### I. THE COURT SHOULD *NOT* VACATE DEFENDANTS' DEFAULT

At a high level, Defendants' Motions are brought under Fed. R. Civ. P. 12(b)(1), 12(b)(2), 12(b)(6), and 21. Yet, as this Court has noted multiple times, Defendants have been in default since July 2024 and remain so. In light of its ongoing default, Defendants' arguments that any parties are improperly joined must be rejected. *Lyons Partnership v. D&L Amusement & Entertainment, Inc.*, 702 F. Supp. 2d 104, 112 (E.D.N.Y. 2010) (rejecting argument that joinder was improper because "there is no prejudice to any defaulting defendant, whose liability may be established upon default irrespective of the presence of any other defendant"). Further, all of the "factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2688.1 (4th ed.).

In light of this, Defendants request "that the Court recognize the extraordinary circumstances that led to the delay and exercise its discretion under Fed. R. Civ. P. 6(b)(1)(B) and 60(b)(1) to excuse any procedural deficiencies." Dismissal Mtn. at 10. Plaintiffs need not rehash Defendants' conduct in this action, as the Court did so just last week. *See generally Hossain*, 2025 WL 2578128, at *1-5. Suffice to say, Defendants have done their "level best to avoid participating in this litigation" and their default should not be vacated. ECF No. 72 at 30:23-24.

"[I]n deciding whether to vacate a default judgment, consider three factors: (1) whether the default was willful; (2) whether a meritorious defense is presented; and (3) whether setting aside the default would prejudice the non-moving party." *Gunnells v. Teutul*, 469 F. Supp. 3d 100, 102-03 (S.D.N.Y. 2020) (cleaned up). "While none of these factors is alone dispositive, the Court should consider and weigh all three." *Id.* None of those factors weigh in Defendants' favor.

**A. Defendants' Default Was Willful**

As this Court recognized, "prior counsel for Defendants had, while claiming to participate in good-faith negotiations with Plaintiffs' counsel, in fact provided cover for Defendants to transfer assets from the United States." *Hossain*, 2025 WL 2578128, at *1; *see also id.* ("Plaintiffs alleged that Defendants, while ostensibly taking steps to bring the Chorki website into compliance with the VPPA, had simultaneously been transferring their digital assets from servers in the United States to servers abroad.").

Defendants contend their default was due to "the July 2025 nationwide political upsurge, which included government-imposed internet shutdowns and significant disruptions to business operations." Dismissal Mtn. at 8. The turmoil Defendants reference occurred between July and August *2024*, with Internet access being restricted during that time.[1] But Defendants' prior counsel never indicated to Plaintiffs that he was unable to reach his client during this time; he simply stopped responding. ECF No. 45-2 (correspondence between Plaintiffs' counsel and Defendants' prior counsel in June 2024). In fact, the minimal discovery Defendants did produce shows their employees had e-mail access and were working to replace ViewLift as early as *August 15, 2024*. Kopel Decl. Ex. 1 at 17 (e-mail thread showing e-mail by Ankur Saha, a Mediastar employee, to

[1] *See, e.g.*, JULY REVOLUTION (BANGLADESH), WIKIPEDIA, https://en.wikipedia.org/wiki/July_Revolution_(Bangladesh); 2024 BANGLADESH INTERNET BLACKOUTS, WIKIPEDIA, https://en.wikipedia.org/wiki/2024_Bangladesh_internet_blackouts.

Viewlift; Redoan Rony is copied as well). And of course, between November 2024 and February 2025, Defendants moved their digital assets to Bangladesh. ECF Nos. 45-3–45-7. Suffice to say, the political turmoil in Bangladesh did not prevent Defendants from corresponding with their vendors and moving assets out of the United States after August 2024, meaning it should not have prevented Defendants from appearing in this action either.

By the same token, Defendants' delay is not justified by the fact they retained counsel "at a later stage," and Defendants' counsel "required additional time to familiarize themselves with the complex factual and procedural history." Dismissal Mtn. at 8. There was no "complex" case history to learn: Defendants defaulted and nothing happened in the case for almost a year while "Defendants [] transfer[red] assets from the United States" in the background. *Hossain*, 2025 WL 2578128, at *1. There was no legitimate reason why Defendants could not have retained counsel between August 2024 and February 2025. Further, although Defendants claim they required "proper document collection" to move to dismiss (Dismissal Mtn. at 8), they only produced sixteen pages of documents in discovery (Kopel Decl. Ex. 1),[2] and Defendants cite exactly zero of those in their moving papers. None of this conduct suggests Defendants' delay was the result of "excusable neglect." Dismissal Mtn. at 8.[3]

On top of all this, Defendants' current counsel appeared in this case on February 10, 2025 and never once requested to set aside the default until (arguably) August 21, 2025, more than six months later. Defendants make no attempt to explain why not.

Thus, Defendants' default was willful.

[2] Defendants also claim their counsel "moved swiftly to file necessary documents" "as soon as the situation became favorable to collect documents." Dismissal Mtn. at 9. It is unclear what this means. Jurisdictional discovery in this matter did not open until March 2025 (ECF No. 58).

[3] Defendants' counsel does not submit a declaration of his own attesting to the time and effort he spent allegedly looking over documents and getting up to speed regarding the case.

**B. Defendants Have Not Presented A Meritorious Defense**

To vacate the default, Defendants must also show they have "a meritorious defense." *Gunnells*, 469 F. Supp. 3d at 103. As this Court has already found, "considering the allegations set forth in the Complaint (as well as Defendants' merits-based responses to date), the Court believes that Plaintiffs have demonstrated a likelihood of success on the merits." *Hossain*, 2025 WL 2578128, at *6. Nothing in Defendants' present Motions changes that. *See* Argument §§ II-III, *infra*. Accordingly, this factor is not met.

**C. Plainitffs Have Been Prejudiced By Defendants' Conduct**

Finally, the Court must evaluate "whether setting aside the default would prejudice the non-moving party." *Gunnells*, 469 F. Supp. 3d at 103. To that end, Defendants argue "Plaintiffs have suffered no cognizable prejudice as a result of the brief delay" and "[t]he delay did not affect any substantive rights or impede the progress of the case." Dismissal Mtn. at 9. Defendants' "delay," however, was not brief; Defendants waited nearly a year to appear in this action to "provide[] cover for Defendants to transfer assets from the United States." *Hossain*, 2025 WL 2578128, at *1." And as this Court has already found, Defendants' conduct has already prejudiced and could further prejudice Plaintiffs:

> Defendants' conduct in (i) moving digital assets from the U.S. during the pendency of the lawsuit, while their counsel purported to negotiate in good faith with Plaintiffs' counsel, and (ii) presenting shifting, inconsistent, and unsworn explanations to the Court regarding their assets in the U.S. and abroad, suffices to demonstrate irreparable harm; absent injunctive relief, Plaintiffs could very well end up with a substantial judgment and no means to enforce it.

*Id.*, at *6. Accordingly, Defendants cannot demonstrate an absence of prejudice to Plaintiffs.

## II. DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED

### A. Plaintiffs Have Sufficently Pled A VPPA Claim

Defendants argue that Plaintiffs have failed to state a VPPA claim, contending that "Plaintiffs' allegations regarding data disclosure are entirely conclusory." MTD at 10. On the contrary, the Complaint contains every allegation Defendants contend are missing.

***The nature of the disclosed information.*** Plaintiffs conducted "a dynamic analysis on the Chorki App" and Website. Compl. ¶¶ 21, 24. The dynamic analysis found that their full names, e-mail addresses, and the titles of the videos they watched (among other information) was disclosed "when consumers view videos on the Chorki App" and Website. *Id.* ¶¶ 25-27, 36, 41, 51, 65, 67, 69-71, 73, 75-77, 80, 84, 86-89, 101, 108-109, 112-113, 117, 119-121.

***The identity of the purported third-party recipients.*** Plaintiffs allege that Defendants disclosed their PII to Meta (Facebook), CleverTap, Google, and ViewLift. Compl. ¶¶ 25-27.

***The circumstances or mechanisms of the disclosure.*** "Defendants incorporate[d] multiple 'application programming interfaces' … into the App [and Website], either directly or contained inside a software development kit." Compl. ¶ 22. Thus, Defendants disclosed Plaintiffs' and other consumers' PII to the Third Parties through the Third Parties' respective APIs/SDKs. *Id.* ¶ 150.

***The specific harm suffered by Plaintiffs.*** Each Plaintiff alleges that, as a result of Defendants' disclosure of their PII, the Third Parties were "able to identify Plaintiff [] and attribute his video viewing records to an individualized profile of Plaintiff [] in its databases using the PII that Defendants disclosed," and that the Third Parties "compiled Plaintiff['s] [] PII and … activity on the App, which Defendants use for marketing, advertising, and analytics purposes." Compl. ¶¶ 107-110, 115-118. Plaintiffs allege these disclosures were made without their knowledge or consent. *Id.* ¶¶ 105-106, 113-114. As a result, Plaintiffs allege that Defendants' conduct caused them to lose control of their personal information.

The Second Circuit—and every federal circuit court to address the question—has found such violations of the VPPA constitute a concrete harm sufficient for Article III standing. *See, e.g.*, *Salazar v. National Basketball Association*, 118 F.4th 533, 537 (2d Cir. 2025) ("[W]e hold that Salazar has pled an injury that confers Article III standing. His core alleged harm—that his personal information was disclosed to a third party, without his consent, in violation of the VPPA—has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts…") (cleaned up); *Salazar v. Paramount Global*, 133 F.4th 642, 648 (6th Cir. 2025) ("Salazar's asserted injury resembles the harms addressed by these torts because he alleges that Paramount disclosed his private information to Facebook without his knowledge or consent."); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984 (9th Cir. 2017) (finding Article III standing to bring VPPA claim and noting "the statute also protects privacy interests more generally by ensuring that consumers retain control over their personal information").

***The causal connection between Defendants' conduct and Plaintiffs' injuries.*** Plaintiffs allege that Defendants incorporated the Third Parties' APIs/SDKs into the Chorki App and Website, and that Defendants thus caused the disclosure of Plaintiffs' PII to the Third Parties. *See, e.g.*, Compl. ¶¶ 22, 24, 35, 41, 51, 61, 65-66, 69-70, 73-77, 81, 83-84, 86-89, 101,108-109, 112-113, 117-121. Plaintiffs allege Defendants did so knowingly to advertise their services and boost revenue, among other purposes. *See, e.g.*, *id.* ¶¶ 128, 131, 135, 138-139, 144-145, 149-162.

***How Defendants' conduct violates any specific legal duty or standard.*** Based on these allegations, Plaintiffs allege Defendants violated the VPPA. *See, e.g.*, Compl. ¶¶ 136-144.

### B. The Court Denied Defendants' Motion To Compel Discovery And Plaintiffs Are Not Required To Prove Their Case At The Pleadings

Defendants contend that "Plaintiffs' reliance on vague, unsubstantiated claims and their ongoing failure to provide mandatory disclosures render the Complaint not only insufficient under

Rule 12(b)(6) but procedurally defective under Rule 26." Dismissal Mtn. at 13. In support, Defendants cite to several broad categories of information that Plaintiffs have ostensibly failed to produce. *Id.* (citing "[t]echnical records," "[b]usiness records and communications with third-party platforms," "[j]urisdictional evidence," and "[d]ocumentation of alleged harm"). Of course, much of this information is within Defendants' possession and Defendants do not cite any of their specific discovery requests where Defendants asked for this information. And Plaintiffs have produced all the jurisdictional discovery they had, such as subscriber numbers from the Third Parties and the location endpoint analysis. *See, e.g.*, ECF Nos. 45-3–45-8.

Regardless, Defendants ignore that the Court *denied* Defendants' Motion to Compel Discovery. *See* ECF No. 72 at 4:16-17 ("I believe you've exceeded what I ordered in the form of jurisdictional discovery."); *id.* at 32:20-22 ("I am denying each of your three requests because I think we're at a stage too early to do that."). And, of course, Defendants' default precludes it from seeking merits-based discovery." *Indus PVR LLC v. Maa-Sharda, Inc.*, 140 A.D.3d 1666, 1667 (4th Dep't 2016) ("It is well settled that a defendant forfeits the right to discovery by defaulting in answering the complaint."). Given this, Plaintiffs are not deficient on any discovery "obligations."

Moreover, as this Court observed, it is a fundamental principle of Civil Procedure that Defendants are "bound by the well-pleaded allegations of the plaintiffs' complaint. They're not obligated to produce discovery at this time." ECF No. 72 at 31:5-8; *see also DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 113 (2d Cir. 2010) ("[T]he duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."). Of, course, if the Court vacates the default (which it should not), Plaintiffs will need to "prove up their claims." ECF No. 72 at 32:23-24. But at this juncture, Defendants are bound by the allegations in the Complaint, which are more than sufficient to state a claim.

## III. DEFENDANTS' MOTION TO DROP PARTIES SHOULD BE DENIED

### A. The Drop Motion Is Procedurally Deficient

Defendants "move under Rule 21 to (i) drop Plaintiff Shakhawat Hassan for misjoinder … and (ii) drop Transcom Limited because the Complaint pleads no operative conduct by Transcom and, as to Transcom, personal jurisdiction is absent." Drop Mtn. at 4. As an initial matter, it appears that the Court forbade Defendants from filing a "Rule 21" motion at the August 7 hearing. ECF No. 86 at 22:2-3 ("I'm not scheduling anything on your Rule 21 motion…"). And, of course, Defendant's default precludes the Drop Motion "[b]ecause all remaining parties to this action are in default," meaning "no Default Defendant is prejudiced, or has its 'substantial rights' impacted, by disregarding any potential defects related to joinder." *Animaccord LTD. v. Individuals, Partnerships & Unincorp. Assocs. Identified on Schedule "A"*, 2023 WL 6206452, at *3 (E.D. Va. Feb. 28, 2023); ECF No. 86 at 3:22-24 ("[U]nder Rule 21, I don't think that motion is going to succeed. But you're still in default and you can't even do that.").

Moreover, Rule 21 is not a mechanism for dismissal. *See* Fed. R. Civ. P. 21 ("Misjoinder of parties is not a ground for dismissing an action."). Instead, courts have held that moving to dismiss under this rule "is an improper use of Rule 21. Defendants cannot bypass the standard of review of a Rule 12(b)(6) motion by relabeling the motion as one under Rule 21." *Garner v. Behrman Brothers IV, LLC*, 260 F. Supp. 3d 369, 383 (S.D.N.Y. 2017). Thus, Defendants' Drop Motion must be denied for at least three procedural reasons: (i) it is not clear that the Court permitted Defendants to file it; (ii) Defendants are in default; and (iii) moving to dismiss under Rule 21 is improper.

Reading the substance of the Drop Motion, however, Defendants are moving to dismiss Plaintiff Hassan for a lack of standing and failure to state a claim, and moving to dismiss Defendant Transcom for lack of personal jurisdiction and failure to state a claim. Defendants' default

precludes its Rule 21 arguments. Argument § I, *supra*. Regardless, each of Defendants' arguments are meritless for the reasons forth below.

**B. The Court Possesses Personal Jurisdiction Over Transcom, And Plaintiffs Have Set Forth A Valid Claim Against Transcom**

By failing to move to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), Defendant Mediastar concedes that this Court possesses personal jurisdiction over it. *See* Fed. R. Civ. P. 12(h)(1). Further, not once in their Drop Motion do Defendants dispute that the connections to the United States created by the Chorki Service are sufficient for personal jurisdiction. Instead, Defendant Transcom contends the Court lacks personal jurisdiction over it because "[t]he Complaint alleges no conduct by Transcom Limited connected to the OTT platform at issue, naming it only as a foreign holding company." Drop Mtn. at 6-7. This is wrong.

*1. Defendants' "Evidence" Is Procedurally Defective*

In support of its lack of United States connections, Defendants submit the declaration of Redoan Rony, the "CEO of the OTT platform Chorki." Drop Mtn, Ex. A ("Rony Decl.") ¶ 1. Mr. Rony avers that he has "personal knowledge of Transom['s] … corporate structure, business operations, and corporate records." *Id.* ¶ 2. But given Defendants are arguing that Transcom and Mediastar are separate entities, it is not clear why Mr. Rony would have intimate knowledge of Transcom's business operations. Without a credible basis for personal knowledge, the declaration cannot serve as evidence in support of the Drop Motion. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and *show that the affiant or declarant is competent to testify on the matters stated*.") (emphasis added).

More problematically, Defendants never identified Mr. Rony as a person of knowledge during jurisdictional discovery. *See* Kopel Decl. Ex. 2 (Defendants' Answer to Interrogatory No.

1: "Subject to the foregoing objections, Defendants state as follows: Defendants Mediastar Limited d/b/a Chorki and Transcom Limited may be contacted solely through their undersigned counsel."). And Defendants' position throughout this case has been that jurisdiction does not exist over either Defendant because of the alleged lack of Chorki subscribers or assets in the United States, not based on some corporate separation between Transcom and Mediastar. *See, e.g.*, ECF No. 57 at 2 ("I am making every effort to gather and present data with the motion to dismiss that I believe will adequately address Plaintiffs' inquiries, particularly regarding the number of Chorki subscribers located within the United States."); ECF No. 72 at 6:2-7 ("[O]ur position is that if anybody subscribed to Chork[i]'s content by themself without any direct marketing or something, that is not a direct contact with this forum and not with the United States, so that cannot establish any jurisdiction."). Defendants were entitled to fight jurisdiction on any basis they wanted to. But Defendants waited until after jurisdictional discovery was complete, after Defendants stonewalled discovery, and after the position Defendants took was met with skepticism by the Court,[4] to shift positions and fight jurisdiction on other grounds. This is untenable.

The Court allowed for jurisdictional discovery because it "has been burned repeatedly in the past by motions to dismiss on jurisdictional bases that must be conducted in multiple phases as a result of the need for jurisdictional discovery." ECF No. 58 at 3. Defendants' last-minute "evidence" betrays that schedule and should not be allowed. *See* Fed. R. Civ. P. 37(b)(2)(ii) ("If a party … fails to obey an order to provide or permit discovery … the court where the action is

[4] *See, e.g.*, ECF No. 85 at 16:12-18 ("[T]he numbers that you've given have varied so much from hearing to hearing. This is your latest and most accurate figure, you believe, and I appreciate that. And it also suggests that your contemplated personal jurisdiction motion will fail and should not be made.").

pending may … prohibit[] the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.”).

*2. Public Statements By Transcom’s Management Shows It Is Intimately Involved With The Chorki Service*

Normally, Plaintiffs may have renewed their request for further jurisdictional discovery based on Defendants’ conduct, including discovery as to the relationship between Mediastar and Transcom and depositions or Mr. Rony and Transcom executives. However, public statements by Transcom show it was intimately involved in the creation and management of Chorki and the recipient of the revenue derived therefrom, such that the connections the Chorki Service creates with the United States may be imputed onto Transcom.

To begin with, Transcom holds itself as a “business conglomerate” that has a “presence across 67 countries,” including the United States[5]:




[5] TRANSCOM, https://www.transcombd.com/.

Among the businesses that Transcom owns is Mediastar, "[t]he largest Bengali news media company in the world."[6] According to Transcom, it "form[ed] Mediastar Ltd" in 1998 and launched "Prothom Alo" "through Mediastar."[7] Later on, Chorki was formed as an "initiative of Mediastar," although Transcom was quick to note that Mediastar is "owned by Transcom Group."[8]

Already, this should give the Court a flavor that Transcom owns Mediastar and conducts its media ventures through Mediastar, including Chorki. But there is more. In November 2023, Zaraif Hossain—"the Head of Strategy and Transformation at Transcom Ltd" and "the President and Head of Strategy for Chorki"—gave an interview to BBF Digital. Mohammed Sifat, *Chorki Just Needs to Keep Doing What It's Good At, Producing Quality Content: Zaraif Ayaat Hossain*, BBF DIGITAL (Nov. 27, 2023).[9] Mr. Hossain discussed not only Chorki's general strategy, but Transcom's role in overseeing and assisting with that. To begin with, Mr. Hossain admitted that the idea for Chorki was formulated "at the Transcom office":

> Chorki, still at the idea stage, came to my notice towards the end of 2020. When formulating the Chorki idea *at the Transcom office*, the initial intention was to start small and build gradually over time.
>
> …
>
> So it was the combination of quality Bangla content online *and Transcom's synergies* that gave us confidence.

Kopel Decl. Ex. 3 (emphasis added). Mr. Hossain then goes on to describe "what leadership strategies … ushered the company to experience such upward growth." *Id.* Mr. Hossain stated

---

[6] MEDIASTAR, https://www.transcombd.com/businesses/media/mediastar/.

[7] LEGACY, https://www.transcombd.com/legacy/.

[8] MEDIASTAR, https://www.transcombd.com/businesses/media/mediastar/.

[9] Available at https://bbf.digital/chorki-just-needs-to-keep-doing-what-its-good-at-producing-quality-content-zaraif-ayaat-hossain (attached to the Kopel Declaration as **Exhibit 3**).

that "Chorki's entry *with the Transcom ecosystem's muscle power* is our strength." *Id.* (emphasis added). Elaborating on this point, Mr. Hossain stated:

> Chorki's structure is very lean and nimble. Its horizontal management approach allows Chorki to move as fast as any startup would with its young and talented team. All while the *backing of Transcom* gives this startup the systems, processes and capabilities of a large business as well. Apart from my direct involvement in Chorki, *I can bring in resources from the Transcom system for support*. Overall, the combination of Transcom and Chorki makes a perfect balance to operate a visionary startup like Chorki.

*Id.* (emphasis added). In other words, Mr. Hossain admits that Chorki's success has been fueled by the funding, technical and operational support, and guidance provided by Transcom. Indeed, Mr. Hossain analogized the arrangement this way: "Chorki is Tony Stark and Transcom is its Ironman suit." *Id.*

Elaborating on the interplay between Chorki and Transcom, Mr. Hossain stated:

> Chorki functions with the attitude, agility and nimbleness of a startup with full freedom, *and as a extension of Transcom*, it is also able to have the strength of a large business conglomerate. Being the strategy lead for both Transcom and Chorki allows me to bring together the best of both worlds.
>
> …
>
> Unlike venture based startups, Chorki's sole investor is Transcom. *This means that aligning with Transcom is all that is required for Chorki to make big decisions*.
>
> …
>
> So, while functioning with full freedom, Chorki has the ability to tap into Transcom's strength in finance, technology, HR practices and more. *It's the mix of Transcom's culture and capabilities* that has allowed Chorki to succeed in its ecosystem.

*Id.* (emphasis added). To put all this simply, Chorki is highly integrated with and depends entirely on Transcom's infrastructure and investment, from both a monetary standpoint to its leadership.

And of course, Transcom does not do all of this for free. Instead, as Mr. Hossain said in another statement, he envisioned Chorki "bring[ing] in revenue for Transcom Group." *Chorki Will Be Expanding Across The World: Zaraif Hossain*, THE DAILY STAR (Oct. 8, 2023).[10]

Accordingly, Defendants are wrong that there is "no conduct by Transcom Limited connected to the OTT platform." Dismissal Mtn. at 6. Quite the contrary, there is ample evidence that: (i) Transcom purposefully directed its conduct at the United States; (ii) Chorki is a venture launched and overseen by Transcom; (iii) Chorki is led by Transcom personnel and has final say in any decisions related to Chorki; and (iv) Chorki is supported by Transcom's infrastructure and financing—indeed, Transcom is Chorki's only financial backer. This is more than sufficient to show that the connections in the United States created by Chorki can be imputed to Transcom. *See, e.g.*, *Ugalde v. Dyncorp., Inc.*, 2000 WL 217502, at *3 (S.D.N.Y. Feb. 23, 2000) (finding jurisdiction over parent company where "[e]ach of the defendant subsidiaries are wholly-owned by Dyncorp Inc. … Dyncorp Inc. exerts significant financial control over defendant subsidiaries … [and] Dyncorp Inc. exerts significant control over the marketing and operational policies of its subsidiaries … and being heavily involved in the day-to-day management of its subsidiaries").

Separately, Defendants argue the fact that "Chorki is the leading Bangladeshi … video streaming platform" "is fatal to Plaintiffs' jurisdictional claims, as it confirms that Defendants' business operations are purposefully directed toward Bangladesh and South Asia, not the United States." Dismissal Mtn. at 2 (cleaned up). But as Mr. Hossain admitted, "the Bangla-speaking population spread across the world in both West Bengal and non-resident communities is closer to

---

[10] Available at https://www.thedailystar.net/business/organisation-news/press-releases/news/chorki-will-be-expanding-across-the-world-zaraif-hossain-3480066 (attached to the Kopel Declaration as **Exhibit 4**).

300 million globally." Kopel Decl. Ex. 3. Thus, it is clear the Chorki Service is for use beyond Bangladesh.

Further, what matters for purposeful direction is Defendants' knowledge of revenue from U.S. subscribers to Chorki. *Briskin v. Shopify, Inc.*, 135 F.4th 739, 746 (9th Cir. 2025) (finding purposeful direction where "Shopify concedes that its geolocation technology allowed it to know that Briskin's device was located in California when it installed cookies on Briskin's device"); *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 354 (4th Cir. 2020) ("Kurbanov knew the Websites were serving Virginian visitors and yet took no actions to limit or block access, all while profiting from the data harvested from the same visitors."). And here, Defendants admit they know there are at least "5,055 total … [U.S.] subscribers" (ECF No. 86 at 6:4-5), on top of the fact that (i) Defendants' library of video content was previously hosted in the United States (ECF Nos. 45-3–45-5); (ii) Defendants ran marketing campaigns targeted at the United States (Compl. ¶ 17); and (iii) Chorki purposely used of Content Delivery Networks in the U.S. in order to "reduce[] the time it takes for the site to load in the United States." *Will Co. v. Lee*, 47 F.4th 917, 924 (9th Cir. 2022); *see also* ECF No. 45-6 at Rows 24, 31-33. This suffices.

Last, Transcom contends "[w]ithout any alleged forum-specific conduct, exercising personal jurisdiction would violate constitutional due process." Drop Mtn. at 7. But per the above, Transcom has more than sufficient contacts with the United States to make jurisdiction fair and reasonable under Fed. R. Civ. P. 4(k)(2).

Thus, this Court possesses personal jurisdiction over Transcom.

### C. Plaintiff Hassan Was A Chorki Subscriber

Defendants that Plaintiff Hassan should be dismissed from this action because he allegedly "was never a paid Chorki subscriber and alleges no transactional or contractual relationship with Defendants." Drop Mtn. at 6. Of course, Plaintiff Hassan alleges the exact opposite. Compl.

¶ 111 ("In or about April 2023, Plaintiff Hassan created a Chorki account and downloaded the App on his Apple iPhone … Between April 2023 and October 2023, Plaintiff Hassan used the mobile Chorki App on his iPhone to watch various videos from his account.") And for the purposes of a Motion to Dismiss, Defendants are bound by those allegations. *See* Argument § II.B, *supra*.

Regardless, to put this argument to bed, Plaintiff Hassan is providing documentation and a declaration showing he purchased a Chorki subscription in April 2023. Hassan Decl. ¶¶ 2-4; *id.* Ex. 1. This makes Plaintiff Hassan a "purchaser[] or subscriber of goods from a video tape service provider" (*i.e.*, Defendants) and may therefore maintain a VPPA claim. 18 U.S.C. § 2710(a)(1). Further, Plaintiff Hassan alleges that, like all proposed Class Members, "each time [he] viewed a video on the Chorki App, Defendants disclosed his PII to AWS, Google Firebase, and Meta via their respective SDKs." Compl. ¶ 115. Thus, Plaintiff Hassan's claims are "typical of those of the Class." *Id.* ¶ 131. In fact, they are identical. And like all other Class Members, there are numerous common questions of law and fact between Plaintiff Hassan and others. *Id.* ¶ 130. Accordingly, Plaintiff Hassan's claim will rise and fall with every other Class Members' claim.

Therefore, Plaintiff Hassan is properly joined as a plaintiff to this action because his claims "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences" (his subscription to Chorki and the disclosure of his PII), and there are common questions of fact and law as to Plaintiff Hassan and every other Class Member. Fed. R. Civ. P. 20(a)(1).

Defendants' authorities are inapposite. In *Kalie v. Bank of Am. Corp.*, 297 F.R.D. 552, 557 (S.D.N.Y. 2013), "[e]ach of th[e] 16 plaintiffs entered into a different loan transaction at a different time, and with one exception, each of the 16 plaintiffs' claims relate to a distinct property." By contrast, Plaintiff Hassan's claim, like all Class Members' claims, subscribed to the same Chorki service, used the same Chorki App, and had the same information disclosed to the Third Parties.

Thus, Plaintiff Hassan's claim is the same as everyone else's, and the witnesses and evidence needed to prove that claim will be the same as every other Class Member. For these same reasons, *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 160-61 (S.D.N.Y. 2009), is distinguishable, as the plaintiff did not allege "that any Defendant other than Tweed was personally involved in conducting the allegedly inappropriate pat-down searches of Plaintiff," making severance of these other defendants warranted.[11] Finally, in *Wyndham Associates v. Bintliff*, 398 F.2d 614 (2d Cir. 1968), "[t]he circumstances … were unusual in that venue in the transferee forum would have been improper as to one of the defendants that the court elected to sever and in that the other defendant that the court severed was only indirectly connected to the main subject matter of the action." *Jewell v. Music Lifeboat*, 254 F. Supp. 3d 410, 423 (E.D.N.Y. 2017) (distinguishing *Wyndham Associates*). Here, however, Plaintiff Hassan is a resident and citizen of New York, so venue is proper (Compl. ¶¶ 120, 126), and Plaintiff Hassan's claims are as connected to this litigation as any other Class Member. Further, Defendants do not explain why litigating two separate suits involving the same issue in this District would be more "efficient."

Accordingly, Plaintiff Hassan's claim should not be severed from this case.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' Motions.

[11] As an aside, the language Defendants quote from *Deskovic*—that severance of claims was warranted because the claims required "entirely different witnesses and documentary proof"—does not appear in that case. That exact language can be found in *Williams v. Smith*, 2020 WL 759684, at *7 (W.D.N.Y. Feb. 11, 2020). And *Deskovic* cites to *Deajess Med. Imaging, P.C. v. Travelers Indem. Co.*, 222 F.R.D. 563, 564 (S.D.N.Y. 2004), which states the claims would "require different witnesses and documentary proof," but omits the word "entirely."

Dated: September 12, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Yitzchak Kopel*
Yitzchak Kopel

Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiffs*

**L.R. 7.1(C) CERTIFICATION**

I hereby certify that the foregoing Memorandum of Law contains 5,536 words, which meets the word-count limits of both L.R. 7.1(c) and Rule 4.B of Judge Failla's Individual Rules of Practice in Civil Cases.

Dated: September 12, 2025

By: */s/ Yitzchak Kopel*
Yitzchak Kopel