UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MUZAKKIR HOSSAIN and SHAKHAWAT HASSAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MEDIASTAR LIMITED d/b/a CHORKI,<br><br>Defendant. | Case No. 1:24-cv-01201-KPF<br><br>Hon. Katherine P. Failla |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Dated: April 17, 2026

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Proposed Class Counsel*

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ..... 1

SUMMARY OF COMMON EVIDENCE ..... 2

I. OVERVIEW OF THE CHORKI SERVICE ..... 2

II. DEFENDANT TRANSMITS CLASS MEMBERS' PERSONALLY IDENTIFIABLE INFORMATION TO THE THIRD PARTIES ..... 3

A. Defendant Disclosed Class Members' PII To Clevertap On The Chorki Android App ..... 4

B. Defendant Disclosed Class Members' PII To Viewlift On The Chorki iOS App ..... 7

C. Defendant Disclosed Class Members' PII To Google On The Chorki iOS App And Chorki Website ..... 8

1. Google Firebase On The Chorki iOS App ..... 8

2. Google Analytics On The Chorki Website ..... 9

D. Defendant Disclosed Class Members' PII To Meta On The Chorki App ..... 11

III. DEFENDANT KNOWINGLY DISCLOSED USERS' PERSONAL INFORMATION TO THE THIRD PARTIES FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS ..... 13

LEGAL STANDARD ..... 15

ARGUMENT ..... 17

I. THE REQUIREMENTS OF RULE 23(A) ARE READILY MET ..... 17

A. Numerosity Is Satisfied ..... 17

B. Commonality Is Satisfied ..... 17

C. Plaintiffs' Claims Are Typical Of The Classes ..... 19

D. Plaintiffs Will Adequately Represent The Class ..... 19

1. Plaintiffs' Interests Do Not Conflict With The Interests Of The Class ..... 20

2. Plaintiffs' Counsel Are Qualified ..... 20

E. The Class May Be Objectively Ascertained ..... 21

II. THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(B)(2) ..... 23

III. THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(B)(3) ..... 24

A. Common Questions Of Law Or Fact Predominate ..... 25

B. Class Litigation Is Superior To Other Methods Of Adjudication ..... 26

CONCLUSION ..... 27

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 15, 25

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) .......... 16, 25

*Au Bon Pain Corp. v. Artect, Inc.*,
653 F.2d 61 (2d Cir. 1981) .......... 16

*Azor-El v. City of New York*,
2024 WL 4326921 (S.D.N.Y. Sept. 27, 2024) .......... 19, 23, 24

*Carpenters Pension Trust Fund v. Barclays PLC*,
2015 WL 5000849 (S.D.N.Y. Aug. 20, 2015) .......... 26

*Civic Ass'n of the Deaf v. Giuliani*,
915 F. Supp. 622 (S.D.N.Y. 1996) .......... 18

*Ebin v. Kangadis Food Inc.*,
297 F.R.D. 561 (S.D.N.Y. 2014) .......... 21

*Ernst v. ZogSports Holdings LLC*,
2019 WL 1435933 (C.D. Cal. Feb. 21, 2019) .......... 22

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
317 F.R.D. 397 (S.D.N.Y. 2016) .......... 26

*Gortat v. Capala Bros., Inc.*,
257 F.R.D. 353 (E.D.N.Y. 2009) .......... 16, 17

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) .......... 17

*In re Petrobas Securities*,
862 F.3d 250 (2d Cir. 2017) .......... 21

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 415 (S.D.N.Y 2015) .......... 27

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001) .......... 16

*Jancik v. WebMD LLC*,
2025 WL 560705 (N.D. Ga. Feb. 20, 2025) ........ 21, 23, 24

*Katz v. Curis Pharmacy, LLC*,
2023 WL 5769499 (S.D.N.Y. Sept. 7, 2023) ........ 16

*Lenorowitz v. Mosquito Squad of Fairfield & Westchester Cnty.*,
2023 WL 2612874 (D. Conn. Mar. 23, 2023) ........ 23

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997) ........ 16, 18

*Martinek v. AmTrust Fin. Servs., Inc.*,
2022 WL 326320 (S.D.N.Y. Feb. 3, 2022) ........ 17, 18, 20

*Merino v. Beverage Plus Am. Corp.*,
2011 WL 3739030 (S.D.N.Y. Apr. 12, 2011) ........ 18

*Moore v. PaineWebber, Inc.*,
306 F.3d 1247 (2d Cir. 2002) ........ 25

*Perez v. AC Roosevelt Food Corp.*,
2011 WL 13377561 (E.D.N.Y. Apr. 11, 2011) ........ 17

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) ........ 16

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993) ........ 19

*Robinson v. New York City Transit Auth.*,
2020 WL 5814189 (S.D.N.Y. Sept. 30, 2020) ........ 24

*Rodriguez v. Westech Sec. & Investigation Inc*,
2026 WL 743454 (S.D.N.Y. Mar. 16, 2026) ........ 19, 21, 23

*Salam v. Lifewatch, Inc.*,
2016 WL 8905321 (N.D. Ill. Sept. 6, 2016) ........ 22

*Seijas v. Republic of Argentina*,
606 F.3d 53 (2d Cir. 2010) ........ 26

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) ........ 13

*Sutton v. TED Foundation, Inc.*,
2026 WL 207000 (S.D.N.Y. Jan. 27, 2026) .......... 4, 11, 20

*Sykes v. Mel S. Harris and Associates LLC*,
780 F.3d 70 (2d Cir. 2015) .......... 18, 25

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.*,
373 F.3d 241 (2d Cir. 2004) .......... 16

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 18, 24

*Zaklit v. Nationstar Mortg. LLC*,
2017 WL 3174901 (C.D. Cal. 2017) .......... 26

**STATUTES**

18 U.S.C. § 2710 .......... 1

18 U.S.C. § 2710(a)(1) .......... 18

18 U.S.C. § 2710(c)(2)(A) .......... 25

**RULES**

Fed. R. Civ. P. 23 .......... 15, 16

Fed. R. Civ. P. 23(a) .......... 2, 16, 17, 21

Fed. R. Civ. P. 23(a)(1)-(4) .......... 17, 19, 20

Fed. R. Civ. P. 23(b) .......... 2, 16

Fed. R. Civ. P. 23(b)(2) .......... 2, 23, 24

Fed. R. Civ. P. 23(b)(3)(A)-(D) .......... 2, 24, 25, 26

## INTRODUCTION

Over two years ago, Plaintiffs Muzakkir Hossain and Shakhawat Hassan ("Plaintiffs") brought a proposed class action against Defendant Mediastar Limited d/b/a Chorki ("Defendant" or "Chorki") and then-Defendant Transcom Limited, alleging the Chorki video streaming website and mobile applications disclosed users' identities and the videos users watched to third parties without consent in violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. *See* ECF No. 1.[1] As this Court is aware, Chorki has been in default for most of this action's procedural history. *See* ECF Nos. 30, 115. But the evidence supporting class certification has been clear throughout this time.

Chorki owns and operates a Bangladeshi video streaming service of the same name. In the United States, the Chorki mobile application is available for download from the Google Play Store and the Apple App Store, and the Chorki website is available to all those with Internet access. Defendant offers only pre-recorded videos on its streaming service, and most of Defendant's content requires a paid subscription to watch. During the Class Period, regardless of payment, watching even a free Chorki video required signing up for an account, which in turn required a user to provide their e-mail address, as well as first and last name.

In late 2023, prior to filing the Complaint (ECF No. 1), Plaintiffs' counsel enlisted a technological expert to conduct a dynamic analysis of the Chorki mobile apps and website. The dynamic analysis confirmed that Defendant discloses the video-viewing records and e-mail addresses (and in some cases, full names) of users to third parties without users' consent. These

---

[1] On February 2, 2026, the Court granted Transcom's motion to dismiss, leaving Chorki the sole defendant in this action. *See* ECF No. 108.

third parties include, but are not limited to, Meta, Google, Clevertap, and Viewlift (collectively the "Third Parties").[2]

Plaintiffs now move, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2)-23(b)(3), to certify the following Class:

> All Chorki account holders who, between February 16, 2022 and November 6, 2024 (the "Class Period"), viewed at least one video on the Website or on the App (the "Class").

The "App" refers to the Chorki Android and iOS mobile applications owned and operated by Defendant. "App" collectively refers to both mobile applications, unless specified to mean one or the other. The "Website" refers to the www.chorki.com website owned and operated by Defendant. Together, the App and Website collectively mean the "Chorki Service," which provides video streaming services to users.

As detailed herein, the Class meets the requirements of Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## SUMMARY OF COMMON EVIDENCE

### I. OVERVIEW OF THE CHORKI SERVICE

Defendant owns and operates the Chorki Service that is available to U.S. users. *See* Compl. ¶ 121. The Chorki Service provides only pre-recorded video content, and the user interface is offered in English and Bangladeshi.[3] *See* Compl. ¶¶ 14-15. Chorki is "the leading Bangladeshi

---

[2] This memorandum incorporates the definitions within the Complaint (ECF No. 1). However, where in the Complaint, "Third Parties" referred to WizRocket, Inc. (d/b/a "CleverTap"), Google Firebase ("Google"), Meta Inc. ("Meta"), and Amazon Web Services ("AWS"), Plaintiffs' counsel later learned that AWS did not own or operate Viewlift, Inc. ("Viewlift"). *See* Kopel Decl. ¶ 8; *id.* at Ex. 7. Therefore, the definition of Third Parties here differs from the one in the Complaint by substituting Viewlift for AWS.

[3] *See* SWITCH LANGUAGE, CHORKI.COM, https://www.chorki.com/switch-language?redirect_to=%2F (last visited April 6, 2026).

subscription on-demand video streaming platform focused on providing world-class Bangla language content." Compl. ¶ 11. Chorki monetizes its extensive viewership with subscriptions. When users subscribe to the Chorki Service, they are asked to input their personal information, including their e-mail addresses and payment information. *See* Kopel Decl. ¶ 2; *see also* Compl. ¶¶ 12-13.

## II. DEFENDANT TRANSMITS CLASS MEMBERS' PERSONALLY IDENTIFIABLE INFORMATION TO THE THIRD PARTIES

Based on Plaintiffs' counsel's dynamic analysis of the Chorki Service, Defendant integrated third party software into the Website and App. The dynamic analysis uncovered that during the Class Period, Defendant integrated third-party software into the Chorki Service. Into the iOS App, Defendant integrated the Meta, Google Firebase, and Viewlift SDKs, and into the Android App, Defendant integrated the Meta and Clevertap SDKs. Into the Website, Defendant integrated the Meta Tracking Pixel and Google Analytics.

The following table shows the categories of PII that Defendant discloses to the listed third parties when a user views a video on the Android App:

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Meta (Facebook)** | Video ID, Video Title, Video Metadata, Video Play Event | Email, Full name | UserID, AAID |
| **CleverTap** | Video ID, Video Title, Time spent watching | Email Full name | UserID, IP address, Zip code |

Compl. ¶ 25. When consumers view videos on the iOS App, Defendant discloses the following PII to the listed third parties:

//

//

//

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Meta (Facebook)** | Video ID, Video Title, Video Metadata, Time spent watching | Email | UserID |
| **App-Measurement (Google Firebase)** | Video ID, Video Title | Email | UserID |
| **ViewLift (AWS)**** | Video ID, Video Title, Time spent watching | Email, Estimated: *IP address, Zip code* | UserID |

*Id.* ¶ 26. And when consumers view videos on the Website, Defendant discloses the following PII to the listed third parties:

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Meta (Facebook)** | Video URL, Video Play Event | Full name Hashed: *Email, full name, zip, city, state* | fbp |
| **Google Analytics** | Video URL, Video Title, Video Play Event | Full name, Email | UserID, cid |

*Id.* ¶ 27. Defendant integrates each of the following third party's software into the Website and App to track and analyze users' data to improve Defendant's marketing and advertising capabilities, and thus, ultimate monetization of Defendant's streaming content.

Notably, as the following screenshots from the dynamic analysis illustrate, Defendant "share[d] easily identifiable information on specific users linked to a specific video viewed," rather than "incomprehensible strings of characters." *Sutton v. TED Foundation, Inc.*, 2026 WL 207000, at *8 (S.D.N.Y. Jan. 27, 2026).

### A. Defendant Disclosed Class Members' PII To Clevertap On The Chorki Android App

CleverTap develops, owns, and operates the SDK of the same name. *See* Compl. ¶ 29. Once integrated into a mobile application, the CleverTap API allows an app developer to, among other features, "[h]arness big-data to drive targeted customer engagement through automated

segments, advanced analytics and actionable intelligence," and "[t]ailor customer interactions based on demographics, prior behavioral patterns, real-time actions and recommend next best experiences." Compl. ¶ 30. CleverTap's technology gives clients such as Defendant the capabilities they need to "[i]ngest, analyze and segment customer data" and engages users through various channels. In sum, CleverTap's rich analytics data processing functions allow customers like Defendants to "[u]tilize analytics tools … [to] [g]ain insights into user behavior and measure campaign impact for informed decision making." Compl. ¶¶ 29-32.

Defendant utilized each and every one of these features and disclosed Android App users' PII to CleverTap through the CleverTap API to assist with Defendant's marketing, data analytics, and revenue generation. *See id.* ¶ 34. As relevant here, Defendant disclosed to CleverTap via the CleverTap API an Android App user's: (i) full name; (ii) e-mail address; and (iii) the name of the pre-recorded video requested or obtained by the user—either as the name of the TV series and TV show episode watched by the user, or the name of the movie watched by the user, among other information:


```
[{"g":"__dfa3187a811f481ea1dfa43569003ad2","type":"meta","af":{"Build":"187",
"Version":"1.0.87","OS Version":"12","SDK
Version":40502,"Latitude":42.3667,"Longitude":-73.275,"Make":"Google","Model"
:"AOSP on
sargo","Carrier":"Mint","useIP":true,"OS":"Android","wdt":2.45,"hgt":4.57,"dp
i":440,"dt":1,"abckt":"active","cc":"us","wifi":true,"BluetoothVersion":"ble"
,"Radio":"Unknown"},"id":"R9Z-4W5-WK6Z","tk":"504-1c2","l_ts":1701715293,"f_t
s":1701715240,"ct_pi":"Email,Identity","ddnd":false,"rtl":[],"frs":false,"arp
":{"sv":40502,"dh":-1312704180,"wdt":2,"d_ts":1701715238,"hgt":4,"av":"1.0.87
","v":2,"e_ts":0,"j_n":"Zw==","i_n":"ZmJlfwMABA0=","r_ts":1701715293,"id":"R9
Z-4W5-WK6Z","j_s":"{ }"},"ref":{"us":"google-play","um":"organic"},
"imp":0,"tlc":[]},{"profile":{"MSG-whatsapp":false,"Email":"peppymay@yahoo.co
m","Amount":0,"Free Trial":"No","Discount Amount":0,"User Status":"Never
subscribed","Identity":"3e9b6014-1c14-4132-a903-ab8d97da5e2e","Registration
Method":"viewlift","Source":"android","Name":"peppy
may","Carrier":"Mint","cc":"us",
"tz":"America\/New_York"},"s":1701715237,"pg":2,"type":"profile","ep":1701715
290,"f":true,"lsl":0,"dsync":true},{"profile":{"location":"Lenox,
Massachusetts, United States","Latitude and longitude":"42.3667, -73.275",
"Carrier":"Mint","cc":"us",
"tz":"America\/New_York"},"s":1701715237,"pg":2,"type":"profile","ep":1701715
291,"f":true,"lsl":0,"dsync":true},...]
```

```
[{"g":"__dfa3187a811f481ea1dfa43569003ad2","type":"meta","af":{"Build":"187",
"Version":"1.0.87","OS Version":"12","SDK
Version":40502,"Latitude":42.3667,"Longitude":-73.275,"Make":"Google","Model"
:"AOSP on
sargo","Carrier":"Mint","useIP":true,"OS":"Android","wdt":2.45,"hgt":4.57,"dp
i":440,"dt":1,"abckt":"active","cc":"us","wifi":true,"BluetoothVersion":"ble"
,"Radio":"Unknown"},"id":"R9Z-4W5-WK6Z","tk":"504-1c2","l_ts":1701715732,"f_t
s":1701715240,"ct_pi":"Email,Identity","ddnd":false,"rtl":[],"frs":false,"arp
":{"sv":40502,"dh":-1312704180,"wdt":2,"d_ts":1701715238,"hgt":4,"av":"1.0.87
","v":2,"e_ts":0,"j_n":"ZmJlfwMABA0=","i_n":"ZmJlfwMABA0=","r_ts":1701715731,
"id":"R9Z-4W5-WK6Z","k_n":"DHpweFcJUwJna2ZmZjljfx8EAAdldzNyZ2l\/KlAIVQ1gPjN+M
mg3aRIcERYnPyI7LjczMnJJUFw4NXwoODdwFg==","j_s":"{
}"},"ref":{"us":"google-play","um":"organic"},"imp":0,"tlc":[]},
{"evtName":"Watched","evtData":{"subtitles":"N","Platform":"android","buffer_
time":1,"rating":"NR","Play Source":"Beyond Border_Show Detail","Listened
Time":0,"Show name":"Weightlifting Fairy","Content Title":"Weightlifting
Fairy Episode 01","Episode Number":"1","Watched time":"1
Minutes","watchPercentile":"1_minute","Content Type
Detail":"movies","Playback Type":"streamed","Season Number":"1","Network
Type":"Wifi","Content Duration":"30.5 Minutes","Content
ID":"c63ff78e-655a-44de-9932-e51c24bd3050","Content
Type":"VIDEO","freeOrPaid":"PAID","Stream":"1mins","buffer_count":1},"s":1701
715237,"pg":9,"type":"event","ep":1701715762,"f":true,"lsl":0,"wzrk_error":{"
c":513,"d":"Page Viewed is a discarded event name. Last event
aborted."},"dsync":false}]
```


*See id.* ¶¶ 35-36; Kopel Decl. Ex. 8. Defendant's disclosure to Clevertap even includes the fact that the user watched the pre-recorded video ("evtName"), as well as how much of the video the user watched ("watchPercentile"). *See id.*

In addition, while the user's name and email address may be disclosed in a separate transmission from the disclosed watched video, an ordinary person could still link the two transmissions because each transmission contains the same "g" and "s" fields. *See* Kopel Decl. Ex. 8. Here, the "g" cookie identifier is "__dfa3187a811f481ea1dfa43569003ad2" while the "s" cookie identifier is "1701715237". Both fields remain unchanged throughout the two transmissions, thus allowing even an ordinary person to link a user's identity (through email address and first and last name) to the exact video they watched. *See id.*

### B. Defendant Disclosed Class Members' PII To Viewlift On The Chorki iOS App

During the Class Period, Defendant disclosed iOS App users' PII to third party Viewlift, Inc. *See* Compl. ¶ 41; Kopel Decl. Ex. 8.[4] Viewlift is an "[e]nd-to-end video platform" that powers live and video on demand streaming businesses. Compl. ¶ 37. ViewLift provides customers like Defendant a "purpose-built, end-to-end platform [that] ensures successful streaming."[5] Through Viewlift's suite of services, Defendant is able to "[b]uild … scalable, tech-driven infrastructure to bring your content into the spotlight."[6] Viewlift's capabilities include capturing users' data and cataloging it into a "360-degree data & analytics dashboard."[7] This means Viewlift helps Defendant capture every action by users of the Chorki Service, from "engagement and revenue to marketing and traffic," and then to "user acquisition."[8] In sum, Viewlift's "personalized viewing recommendations" "identify those in danger of leaving soon" and allows Defendant to "use insights on marketing and engagement to drive tactics for higher user retention," ultimately "mak[ing] better business decisions."[9]

Defendant and Viewlift have publicly touted their partnership, noting that Defendant's success was bolstered by "ViewLift's ability to deliver a seamless and personalized viewing

---

[4] As of approximately October 31, 2024, Defendant no longer employed Viewlift as its OTT platform. However, throughout the relevant Class Period, Defendant employed the Viewlift SDK on the iOS App. *See* Kopel Decl. ¶ 6; *see also* ECF No. 89-1 (emails between Viewlift executives and Chorki ending on October 31, 2024).

[5] VIEWLIFT, https://viewlift.com/video-platform/ (last accessed Feb. 10, 2025).

[6] *Id.*

[7] OTT ANALYTICS, VIEWLIFT, https://viewlift.com/video-platform/ott-analytics/ (last accessed Feb. 10, 2025).

[8] *Id.*

[9] OTT PERSONALIZATION, VIEWLIFT, https://viewlift.com/video-platform/ott-personalization/ (last accessed Feb. 10, 2025); OTT Analytics, Viewlift, https://viewlift.com/video-platform/ott-analytics/ (last accessed Feb. 10, 2025).

experience along with 360-degree analytics." Compl. ¶ 155. As relevant here, Defendant disclosed to AWS via the Amazon SDK an Android App user's: (i) e-mail address; and (ii) the name and URL of the pre-recorded video requested or obtained by the user, among other information:




*Id.* ¶ 41.

### C. Defendant Disclosed Class Members' PII To Google On The Chorki iOS App And Chorki Website

#### 1. *Google Firebase On The Chorki iOS App*

The Google Firebase SDK ("Firebase SDK") is owned and operated by Firebase, Inc., which is Google's mobile development platform. Compl. ¶ 42. Firebase includes many technological tools that Firebase offers to clients like Defendant. *See id.* ¶ 43. These tools allow clients like Defendant to "[e]ngage end users … using custom notifications," "[m]onetize an app … [and i]ncrease revenue by personalizing user experience," and "[t]est and rollout features … [to e]nsure stable and delightful features before launch." *Id.* "At the heart of Firebase is Google Analytics, an unlimited analytics solution." *Id.* ¶ 46. Using the Firebase SDK, which includes integration of Google Analytics, Defendant can get "unlimited reporting for up to 500 distinct events" of their choosing. *Id.* The analytics reports Google Analytics provides help customers

like Defendant "understand clearly how [their] users behave, which enables [them] to make informed decisions regarding app marketing and performance optimizations." *Id.* All of these automatically collected events and user properties, as well as custom events and user properties, can be seen in the overview report on the Google Analytics SDK's "Dashboard." *Id.* ¶ 50. This report summarizes data important to a customer's business to help "monitor engagement," "see how much revenue" is being generated, and "evaluate the success of … app releases." *Id.*

As relevant here, Defendant disclosed to Google via the Firebase SDK an iOS App user's: (i) e-mail address; and (ii) the name and URL of the pre-recorded video requested or obtained by the user, among other information:


```
.EmailId..prairie837@gmail.com. add_to_cart......1

.pageName.&Player Screen - On the Road of Courage. page_view......1
.....1.........1.._fi ..........1.._fot .....1.........1.._sid
..............1.._sno ..........1.._npa
..2......1.._id.$deacddb6-b847-4d94-848c-1d742a6ebc7e........1.._lte
```


Kopel Decl. Ex. 8; *see also* Compl. ¶ 51.

2. *Google Analytics On The Chorki Website*

Google Analytics is part of the Google Marketing Platform, owned and operated by Google LLC. *See* Compl. ¶ 95. For Google Analytics to work, Defendant adds a small piece of JavaScript measurement code to each page on its Website. *See id.* ¶ 97. This tracking code, also called the Google Tag, collects information about "how a user interacted with the [web]page" every time a user visits the Website. *Id.* After collecting this data, the Google Tag sends it to Google Analytics for processing and use. *Id.* Ultimately, the organized data is "compiled into Analytics reports, which Defendant can use to perform in-depth analyses to better understand its customers." *Id.* ¶ 100 (cleaned up). Thus, the Google Analytics platform enables its clients—such as Defendant—to "measure user interactions," "unlock customer-centric measurement," and "anticipate[] future

user actions." *Id.* ¶ 96 (cleaned up). This helps Defendant get more value out of Chorki Service users' data.

As relevant here, Defendant discloses to Google via Google Analytics a Website user's (i) full name; (ii) e-mail address; and (iii) the name and URL of the pre-recorded video requested or obtained by the user, among other information:







*Id.* ¶ 101. While the information identifying the user is disclosed in a separate transmission from information identifying which video the user requested or obtained, this is immaterial because Defendant also discloses the Website user's CID in both transmissions. *Id.* Thus, "an ordinary person, with little or no extra effort could identify a user's video viewing history … by simply matching the [CID] number in the record with a person's name and email address, to the record

with the title of the video viewed by the user with that same [CID] number. *Sutton*, 2026 WL 207000, at *8.

**D. Defendant Disclosed Class Members' PII To Meta On The Chorki App**

The Meta SDK is owned and operated by Meta. *See* Compl. ¶ 52. Meta generates revenue by selling advertising space on its website. *See id.* ¶ 55. Meta sells advertising space by highlighting its ability to target users. *See id.* ¶ 56. Meta can target users so effectively because it surveils user activity both on and off its site. *See id.* This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections." *Id.* ¶ 56.

Once installed onto a mobile application or website, the Facebook SDK allows developers like Defendant to track users' actions. *See* Compl. ¶¶ 57-58. Defendant uses the Meta SDK to track user actions that have been preprogrammed into the SDK, or define their own user actions and set the Facebook SDK to track that. *See id*. ¶ 58-60. Through the Meta SDK, Defendant discloses App users' e-mail addresses, first and last names, User IDs, and video-viewing information in the form of video title and website URL to Meta. *See id.* ¶ 61.

As relevant here, Defendant discloses to Meta via the Meta SDK an Android App user's (i) full name; (ii) e-mail address; and (iii) the name of the pre-recorded video requested or obtained by the user, among other information:

//

//

//

//

//

//

format=json&sdk=android&custom_events=[{"_eventName":"fb_mobile_purchase","_eventName_md5":"8a5ee13e620e68b69633d0d6a3a15ffa","_logTime":1701715315,"_ui":"unknown","_session_id":"d4fda1f3-e4e2-4d23-9287-92ad2f9c0895","User+Id":"3e9b6014-1c14-4132-a903-ab8d97da5e2e","Email":"peppymay@yahoo.com","Transaction+Amount":"0.0","Subscription+Start+Date":"2023-12-04T18:41:54.129Z","Payment+Plan":"1month150823","Discount+Amount":"-7.99","Free+Trial":"No","User+Status":"Subscribed","Registration+Method":"viewlift","Name":"peppy+may","Payment+Handler":"ANDROID","Subscription+End+Date":"2024-01-04T18:41:53.878Z","Country":"United+States","fb_currency":"USD","Subscribed+via+platform":"Android","Transaction+ID":"GPA.3356-8836-3837-23431","_valueToSum":7.99}]&event=CUSTOM_APP_EVENTS&anon_id=XZ584fd030-2e62-42e0-89a1-08429e63608f&application_tracking_enabled=true&advertiser_id_collection_enabled=true&advertiser_id=794da6d2-5cb6-473e-8780-39bf5bb108bb&advertiser_tracking_enabled=true&installer_package=com.android.vending&extinfo=["a2","com.prothomalo",187,"1.0.87","12","AOSP+on+sargo","en_","EST","Mint",1080,2088,"2.75",8,50,35,"America\/New_York"]&application_package_name=com.prothomalo&

format=json&sdk=android&custom_events=[{"_eventName":"play+started","_eventName_md5":"8a48acc580a7922e6bc335cad8b03431","_logTime":1701715344,"_ui":"unknown","_session_id":"d4fda1f3-e4e2-4d23-9287-92ad2f9c0895","contentGenre":"Romance-Family-Society","directorName":"Mostofa+Sarwar+Farooki","playSource":"null_Video+Detail","contentDuration":"84+Minutes","contentId":"a9e43eb7-3e1f-45fd-a261-c141e59e2b3f","actorName":"Mostofa+Sarwar+Farooki,+Nusrat+Imrose+Tisha,+Iresh+Zaker,+Dolly+Zahur,+Sharaf+Ahmed+Jibon,+Monowar+Hossain+Dipjol","contentTitle":"Something+like+an+Autobiography+","networkType":"Wifi","contentType":"VIDEO","playbackType":"Streamed","platform":"Android"},...]&event=CUSTOM_APP_EVENTS&anon_id=XZ584fd030-2e62-42e0-89a1-08429e63608f&application_tracking_enabled=true&advertiser_id_collection_enabled=true&advertiser_id=794da6d2-5cb6-473e-8780-39bf5bb108bb&advertiser_tracking_enabled=true&installer_package=com.android.vending&extinfo=["a2","com.prothomalo",187,"1.0.87","12","AOSP+on+sargo","en_US","EST","Mint",2088,1080,"2.75",8,50,35,"America\/New_York"]&application_package_name=com.prothomalo&

Kopel Decl. Ex. 8; Compl. ¶¶ 65, 80. Again, although the two disclosures are not simultaneous, this is of no import because both transmissions to Meta contain an identical identifier: the Android App user's advertising ID. Here, the unique ID is "=794da6d2-5cb6-473e-8780-39bf5bb108bb". *See* Kopel Decl. Ex. 8.

Also as relevant here, Defendant discloses to Meta via the Meta SDK an iOS App user's (i) e-mail address; and (ii) the name of the pre-recorded video requested or obtained by the user, among other information. *See* Compl. ¶¶ 71, 77, 86.

Detail','contentGenre':'Historical','_ui':'Chorki.VideoDetailViewController','stream':'2mins','directorName':'Proshoon Rahmaan','_logTime':1701713239,'subtitles':'Y','platform':'iOS','email':'prairie837@gmail.com','networkType':'Wifi','contentType':'Video','bufferTime':0,'contentId':'f6a95283-9a03-47cd-9715-7385abc5bb9e','contentDuration':4596,'bufferCount':0,'contentTitle':'Long Period of Persecution','playbackType':'Streamed','actorName':'... Mia Seppo, UN Resident Coordinator, Bangladesh, Steven Corliss, Country Representative, UNHCR, Bangladesh, Brig Gen. (Retd.) Shakhawat Hossain, Security Analyst, Major Gen. (Retd.) Abdur Rashid, Security Analyst, Executive Director, ICLDS, Shamsher Mubun Chowdhury Bir Bikram, Former Foreign Secretary of Bangladesh & International Affairs Analyst','_eventName':'watched','watchPercentile':'2_minutes','userId':'deacddb6-b847-4d94-848c-1d742a6ebc7e'}]","format":"json","extinfo":"['i2','com.prothomalo.chorki','2','2.1','16.7.2','iPhone10,3','en_US','EST','NoCarrier',375,812,'3.00',6,59,46,'America\\\/New_York']","url_schemes"...}

Unlike the Android transmission, the disclosures of iOS App users' PII are in a single transmission.[10]

## III. DEFENDANT KNOWINGLY DISCLOSED USERS' PERSONAL INFORMATION TO THE THIRD PARTIES FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS

CleverTap is a "cloud hosted, customer retention and engagement platform that helps consumer brands maximize the user lifetime value[] users obtain from mobile applications or websites." Kopel Decl. Ex. 1. Defendant causes Chorki subscribers' data to be "transmitted onto [CleverTap's] server." *Id.* Critically, Defendant "choose[s] at [its] discretion what data to be sent to CleverTap for the purpose of utilizing the platform." *Id.*

This means that Defendant knowingly chooses to send Chorki Service users' data to CleverTap to take advantage of CleverTap's technological toolset to improve their analytics, marketing, and advertising. Clevertap's service allows Defendant to "[t]ailor customer

[10] These transmissions are materially distinct from those to Meta in *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 46, 54 (2d Cir. 2025), which included only a "c_user" cookie (rather than the user's full name and/or e-mail) and the title of the video "interspersed with many characters, numbers, and letters (rather than the plain title of the video here with few if any symbols).

interactions based on demographics, prior behavioral patterns, real-time actions and recommend next best experiences." Compl. ¶ 125. CleverTap's capabilities then allow Defendant to analyze the collected user data. *See id.* ¶ 128-29. "Analyzing events provides the capability to understand your audience's behavior on a comprehensive level." *Id.* ¶ 129. "Among other capabilities, CleverTap's analytics technology allows clients such as Defendants to analyze collected user data by various properties and parameters." *Id*. Once Defendant has CleverTap's analysis of users' raw data of actions and patterns performed on the Chorki Service, Defendant can use that information to create and run targeted marketing and advertising campaigns to further monetize their streaming service. *See id.* ¶ 131.

Viewlift helps Defendant to "[b]uild a streaming universe dedicated to [Defendant's] viewers."[11] By tracking each users' actions on the Chorki Service, then categorizing the actions and sorting by various filters, Defendant can learn marketing and advertising patterns that work well with different audiences. This allows Defendant to apply "hyper-personalization [of content, advertising, and marketing] to deliver relevant content that viewers find meaningful."[12] Ultimately, this allows Defendant to "[u]nderstand each user's behaviour and curate content that matches their expectations."[13]

Defendant discloses users' PII to Google for the purposes of marketing, advertising, and analytics. *See* Compl. ¶ 140. Google Firebase helps Defendant track and analyze user behavior on the App, while Google Analytics helps Defendant track and analyze user behavior on the Website. With Google Analytics, Defendant can "[m]easure and report on user activity on

---

[11] OTT PERSONALIZATION, VIEWLIFT, https://viewlift.com/video-platform/ott-personalization/ (last accessed Feb. 10, 2025).

[12] *Id.*

[13] *Id.*

websites, web and mobile apps, and internet-connected devices." *Id.* ¶ 141. Similarly, with Firebase, Defendant can "[g]ain actionable insight into [their] app's performance" through Firebase's "custom view of key performance metrics." Compl. ¶¶ 137-38. Together, the Google Analytics and Firebase tools provide Defendant with insights that allow it to "[m]ake data-driven decisions" and "[m]aximize revenue by using machine learning to customize the best monetization strategy for each user." *Id.* ¶ 139.

Defendant discloses users' PII including email address and video viewing information to Meta through the Facebook SDK (integrated into the App) so that Meta can "personali[ze] content, tailor[] and measur[e] ads, and provid[e] a safer experience" for Chorki Service users. Compl. ¶ 145. Meta's full suite of measurement, analytics, and marketing tools allow Defendant to first test different versions of an advertising strategy or campaign on collected user behavioral data, then apply the version that performs best to their real-life audiences. *See id.* ¶ 159. In the long term, this allows Defendant to build business strategies based on the user data that Meta collects and analyzes for it. Defendant uses Meta's ability to analyze user data, target specific users or groups of users for advertisements, and launch marketing campaigns in conjunction with Meta's other technological offerings to monetize the App and maximize revenue. *See id.* ¶ 160-161.

## LEGAL STANDARD

Class actions are an essential tool for adjudicating cases involving many small claims that are not economically feasible to prosecute individually. In drafting Fed. R. Civ. P. 23, "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Class actions give voice to plaintiffs

who "would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

Plaintiffs' Motion is unopposed, and Defendant has defaulted (again). *See* ECF Nos. 30, 115. Where a Defendant has defaulted, the Court's analysis changes slightly. "Generally, upon entry of a default, the factual allegations in the complaint, except as to damages, must be taken as true." *Katz v. Curis Pharmacy, LLC*, 2023 WL 5769499, at *2 (S.D.N.Y. Sept. 7, 2023); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) (same); *see also Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) (noting it is an "ancient common law axiom that a default is an admission of all well-pleaded allegations against the defaulting party"). From the unopposed facts presented, a court "independently determine[s] that Rule 23's requirements are met." *Katz*, 2023 WL 5769499, at *2.

Plaintiffs must demonstrate by a preponderance of the evidence that the proposed class meets each of the four requirements of Fed. R. Civ. P. 23(a) and also satisfies at least one of the categories provided in Fed. R. Civ. P. 23(b). *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132-33 (2d Cir. 2001). Although the Court must conduct a "rigorous analysis" that "may entail some overlap with the merits of the plaintiff's underlying claim," "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465-66 (2013) (cleaned up). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 466.

Further, "[t]he Second Circuit has emphasized that Rule 23 should be 'given liberal rather than restrictive construction.'" *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)). Indeed, "it seems beyond

peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Id.* at 361-62. Thus, "when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999).

## ARGUMENT

## I. THE REQUIREMENTS OF RULE 23(A) ARE READILY MET

### A. Numerosity Is Satisfied

To satisfy numerosity, Plaintiffs must demonstrate "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Courts in this Circuit presume numerosity at 40 putative class members." *Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *5 (S.D.N.Y. Feb. 3, 2022) (Failla, J.) (cleaned up). Here, during the Class Period, at least [redacted] individuals subscribed through the Chorki iOS App alone. *See* Kopel Decl. ¶ 3; *see also* ECF No. 48-8. In addition, Website users that paid for a subscription on the Website and Android App users who paid for their subscriptions through the Google Play Store during the Class Period increase the size of the class to approximately [redacted] members. *See* Kopel Decl. ¶ 3; *id.* at Exs. 2-3. And Plaintiffs' testing shows that each one of these subscribers would have had their PII disclosed to the Third Parties each time they viewed a video on the Chorki Service. *See* Compl. ¶¶ 25-27; *see also Perez v. AC Roosevelt Food Corp.*, 2011 WL 13377561, at *3 (E.D.N.Y. Apr. 11, 2011) (relying on affidavit to find numerosity satisfied in case with defaulting defendant). Accordingly, numerosity is satisfied.

### B. Commonality Is Satisfied

Next, Plaintiffs must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A common question is one that "drive[s] the resolution of the litigation such that determination of its truth or falsity will resolve an issue that is central to the

validity of each one of the claims in one stroke." *Sykes v. Mel S. Harris and Associates LLC*, 780 F.3d 70, 84 (2d Cir. 2015) (cleaned up). It is sufficient if "a common issue that drive[s] the resolution of the litigation such that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *5 (S.D.N.Y. Feb. 3, 2022) (cleaned up). "Commonality does not mandate that all class members make identical claims and arguments." *Civic Ass'n of the Deaf v. Giuliani*, 915 F. Supp. 622, 633 (S.D.N.Y. 1996) (certifying class). Indeed, "[e]ven a single question of law or fact common to the members of the class will satisfy the commonality requirement." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, Plaintiffs allege "their injuries derive from a unitary course of conduct by a single system," the Chorki Service's clandestine implementation and use of technology to unlawfully disclose users' PII to third parties without consent. *Marisol*, 126 F.3d at 377. This alone is sufficient. *See Merino v. Beverage Plus Am. Corp.*, 2011 WL 3739030, at *2 (S.D.N.Y. Apr. 12, 2011), *report and recommendation adopted*, 2011 WL 3734241 (S.D.N.Y. Aug. 23, 2011) (finding commonality satisfied in New York Labor Law action with defaulting defendants where "all Plaintiffs were subject to the same pay practices … and performed substantially similar duties").

In addition, multiple questions common to the Class exist, including but not limited to: (i) whether an ordinary person could identify a specific individual's video-watching behavior from the information that Defendant disclosed; (ii) whether Defendant disclosed this information to the Third Parties knowingly; (iii) whether Defendant's disclosures were made in the ordinary course of business; (iv) whether Defendant is a video tape service provider; and (v) whether Plaintiffs and Class Members are "consumers." 18 U.S.C. § 2710(a)(1). Thus, commonality is satisfied.

### C. Plaintiffs' Claims Are Typical Of The Classes

Fed. R. Civ. P. 23(a)(3) requires Plaintiffs' claims to be "typical" of the class. Fed. R. Civ. P. 23(a)(3). Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Azor-El*, 2024 WL 4326921, at *9 (S.D.N.Y. Sept. 27, 2024) (Failla, J.) (internal quotations omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). "[C]ourts have made clear that "[t]he typicality requirement is not demanding." *Azor-El*, 2024 WL 4326921, at *9 (cleaned up).

Here, Plaintiffs "suffered the same type of injury as the rest of the class," and Defendant's alleged "failure to comply with the requirements of the [VPPA] … represents a single course of conduct resulting in injury to all class members." *Rodriguez v. Westech Sec. & Investigation Inc*, 2026 WL 743454, at *4 (S.D.N.Y. Mar. 16, 2026) (relying on declarations to establish facts in case with defaulting defendant) (cleaned up). Because Plaintiffs subscribed to and watched videos on the Chorki Service and Defendant disclosed their video-viewing behavior and PII to Meta, CleverTap, AWS, and Google, Plaintiffs' claims will stand and fall with every other Class Member's claims based on the same evidence. *See* Compl. ¶¶ 103-118. Typicality is therefore met.

### D. Plaintiffs Will Adequately Represent The Class

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." *Azor-El*, 2024 WL 4326921, at *10; Fed. R. Civ. P. 23(a)(4). "Adequacy has two components: first, class counsel must be qualified, experienced and generally able to

conduct the litigation, and second, the class members must not have interests that are antagonistic to one another." *Id.* (cleaned up).

*1. Plaintiffs' Interests Do Not Conflict With The Interests Of The Class*

"[T]here is no indication that members of the putative class have interests that either are or are likely to be antagonistic to one another" or that Plaintiffs' interests are likely to be antagonistic to those of the absent Class Members. *Martinek*, 2022 WL 326320, at *7 (S.D.N.Y. Feb. 3, 2022) (finding the plaintiff and his counsel adequate). Plaintiffs Hossain and Hassan, like each absent Class Member, both have a strong interest in proving Defendant's common course of conduct, establishing the unlawfulness of Defendant's conduct, demonstrating the impact of the unlawful conduct, and obtaining redress. Plaintiffs Hossain and Hassan have also demonstrated their commitment to pursue these claims on behalf of absent Class Members by retaining competent counsel, reviewing the Complaint, searching for and producing documents to assist in the litigation investigation, and keeping in frequent contact with counsel regarding the status of the case. *See id.*, at *7 (finding adequacy because the plaintiff's counsel "is an experience[d] law firm that has litigated similar … class actions in the past," and the plaintiff "has demonstrated a willingness to prosecute this action on behalf of the proposed class."); *see also* Kopel Decl. ¶ 4. And Plaintiffs were prepared to sit for a deposition and testify at trial. *See id*.

*2. Plaintiffs' Counsel Are Qualified*

Plaintiffs' counsel—Yitzchak Kopel, Max S. Roberts, and Victoria X. Zhou of Bursor & Fisher, P.A.—are class action lawyers who have extensive experience litigating consumer claims, including data privacy claims and claims under the VPPA. *See* Kopel Decl. Ex. 4; *see also Sutton*, 2026 WL 207000 (denying motion to dismiss VPPA claim where Mr. Kopel, Mr. Roberts, and Ms. Zhou served as counsel); *In re Meta Android Privacy Litig.*, Case No. 3:25-cv-4674, ECF No.

78 (N.D. Cal. Oct. 27, 2025) (appointing Bursor & Fisher as co-lead interim class counsel with Mr. Kopel, Mr. Roberts, and Ms. Zhou serving as the firm's representatives). "The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries in five [now six] class action jury trials since 2008." *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. 2014); *see also Jancik v. WebMD LLC*, 2025 WL 560705, at *8 (N.D. Ga. Feb. 20, 2025) (certifying VPPA class and finding Bursor & Fisher "has demonstrated it has sufficient qualifications to 'adequately prosecute' this case").

**E. The Class May Be Objectively Ascertained**

In addition to the four cornerstones of Rule 23(a), the Second Circuit has also recognized an implied requirement of ascertainability, which "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobas Securities*, 862 F.3d 250, 264 (2d Cir. 2017); *see also Rodriguez*, 2026 WL 743454, at *5. "The standard for ascertainability is not demanding and is designed only to prevent the certification of a class whose membership is truly indeterminable." *Ebin*, 297 F.R.D. at 567 (cleaned up). Moreover, although the membership of the class must be ascertainable "at some point in the case," they "need not be ascertained prior to certification." *Rodriguez*, 2026 WL 743454, at *5.

Here, every element of the Class Definition is based on objective criteria, given that Class membership requires that during the Class Period, Class Members (i) had a Chorki Video Service subscription account; (ii) used their account to watch at least one video; (iii) had their email address disclosed to one or more of the Third Parties; and (iv) had their video-viewing information disclosed to one or more of the Third Parties. These can be readily identified through business records provided by Defendant or third parties, including but not limited to the Third Parties. Indeed, because Defendant's own records would reveal the individual Class Members, denying certification for lack of ascertainability here would disincentivize future defendants from keeping

accurate records. *See, e.g.*, *Ernst v. ZogSports Holdings LLC*, 2019 WL 1435933, at *6 (C.D. Cal. Feb. 21, 2019) ("Moreover, not certifying the class because Defendant did not keep adequate records would provide Defendant with a windfall and encourage employers not to keep adequate records."); *Salam v. Lifewatch, Inc.*, 2016 WL 8905321, at *2 (N.D. Ill. Sept. 6, 2016) ("denying class certification because Defendant is unable to provide list of potential class members would encourage defendants not to keep records, shielding themselves from liability").

As to the first element, given how Chorki subscriptions are sold online on the Website or through the iOS App Store or Android Play Store, consumers receive e-mail receipts reflecting their Chorki subscription purchases from Chorki. Further, Class members who used the App to purchase subscriptions will have additional emails from Apple or Google confirming their subscription purchases or would be able to look up their subscription purchases within the consumers' individual iOS App Store or Google Play Store accounts. Indeed, Plaintiffs themselves have receipts for their purchased subscriptions in the form of either an email from the Apple App Store or an App Store subscription on their account. *See* Kopel Decl. Exs. 5-6.

As to the second, third, and fourth elements of whether a Class Member had their PII disclosed to the Third Parties when they viewed videos (as well as if they viewed at least one video), Plaintiffs established in the Complaint and the dynamic analysis that Defendant disclosed Chorki Service users' PII to at least one of the Third Parties. *See* Summary Of Common Evidence § II, *supra*. Plaintiffs allege that this disclosure occurs for each Chorki Service user. *See* Compl. ¶¶ 5, 25-27, 127, 134-145.

Ascertaining the identities of Chorki Service users will be simple. To view Chorki videos, users must sign up and pay for a Chorki account. *See id.* ¶¶ 11-14. Through third-party discovery, Plaintiffs' counsel has identified the third-party payment processors who receive and manage the

payments of every Chorki Service user. *See* Kopel Decl. ¶ 5. These include Apple, Google, Stripe, Inc., and Paypal, Inc. (collectively the "Payment Processors"). *See id.* Thus, reviewing the business records of the Payment Processors will ascertain the Class Members.

Further, post-certification discovery of the Third Parties' business records will uncover whether a Chorki Service user viewed at least one video, as well as the titles of any viewed videos. *See Rodriguez*, 2026 WL 743454, at *5 (finding ascertainability satisfied when the proposed class could be "ascertained by objective documentation, such as employee payroll records and wage statements"). It is reasonable to assume that if an individual paid for a Chorki Service subscription, they watched at least one video on the Service. However, should the Court require further evidence to demonstrate a Chorki Service user viewed at least one video, courts in this Circuit recognize a mechanism that allows users to self-identify—through sworn affidavits—where "class members cannot otherwise be identified through Defendant's records, expert testimony, or other methods." *Lenorowitz v. Mosquito Squad of Fairfield & Westchester Cnty.*, 2023 WL 2612874, at *3 (D. Conn. Mar. 23, 2023). Applied here, because the Class may be ascertained through the payment processors' records, asking users to self-identify as to whether they watched at least one video during the Class Period will be a simple matter of adding a question in the notice dispersed to the Class. *Jancik*, 2025 WL 560705, at *9 ("[A] class action administrator can take care of any further quality assurance checks … and claims process verifications.").

Accordingly, ascertainability is met.

## II. THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(B)(2)

Fed. R. Civ. P. 23(b)(2) "allows class treatment when the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Azor-El*, 2024 WL 4326921, at *11 (Failla, J.). Fed. R. Civ. P. 23(b)(2) focuses on the acts or omissions of the

defendant, eliminating the superiority and predominance requirements. The Advisory Committee's notes to the 1966 amendment explains general applicability as "action or inaction … directed to a class … even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amends. "Certification under Rule 23(b)(2) is only proper when "a single injunction ... would provide relief to each member of the class." *Azor-El*, 2024 WL 4326921, at *11; *see also Wal-Mart Stores, Inc.*, 564 U.S. at 360 (same). This relief need not be "identical—the relief need only be beneficial." *Robinson v. New York City Transit Auth.*, 2020 WL 5814189, at *6 (S.D.N.Y. Sept. 30, 2020).

Here, Defendant acted uniformly in relation to the Class by surreptitiously disclosing Class Members' PII. Money damages cannot undo the significant privacy violations imposed by Defendant's willful disclosures of Class Members' PII, and a single injunction would provide relief to each member of the Class. Plaintiffs thus seek certification of the Class under Rule 23(b)(2) to (i) enjoin the Chorki.com website from collecting, retaining, and disclosing Class Members' PII including their video-viewing information without Class Members' consent; and (ii) enjoin the Chorki Apps (both iOS and Android) from collecting, retaining, and disclosing Class Members' PII, including their video-viewing information, without their consent.

This requested relief "sweep[s] broadly enough to benefit all members of the proposed class," and "will benefit every member of the proposed class. *Robinson*, 2020 WL 5814189, at *6. This is sufficient. *See also Jancik*, 2025 WL 560705, at *10 ("The Court agrees with Jancik that certification under Rule 23(b)(2) is appropriate.").

## III. THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(B)(3)

Fed. R. Civ. P. 23(b)(3) authorizes class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members,"

and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both requirements are met here.

### A. Common Questions Of Law Or Fact Predominate

The predominance inquiry "tests whether proposed class actions are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623-24. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). Notably, Fed. R. Civ. P. 23(b)(3) calls only for "a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc.*, 568 U.S. at 459 (cleaned up). And, as the Second Circuit has noted:

> the Supreme Court has also instructed that Rule 23(b)(3) does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof … individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole.

*Sykes*, 780 F.3d at 81 (cleaned up). Predominance is met here.

This case will turn entirely on the common questions set forth above (Argument § I.B, *supra*), and each is answerable as to every Class Member using the same evidence. Defendant either is a video tape service provider or it is not. The information that Defendant disclosed either is PII pursuant to the VPPA or it is not. Defendant either knowingly disclosed this information or it did not. And all Class Members are either all consumers for the purposes of the VPPA, or none are. Further, damages can easily be calculated on a classwide basis, given the VPPA provides for liquidated damages of $2,500. *See* 18 U.S.C. § 2710(c)(2)(A); *see also Skyes*, 780 F.3d at 87

(holding it cannot be "disputed that statutory damages … can be assessed on the basis of common proof.").

As such, "Plaintiffs' model survives the minimal scrutiny required under *Comcast* and Rule 23(b)(3)—their theory of liability matches their theory of damages and individualized damages issues will not predominate." *See Carpenters Pension Trust Fund v. Barclays PLC*, 2015 WL 5000849, at *21 (S.D.N.Y. Aug. 20, 2015).

**B. Class Litigation Is Superior To Other Methods Of Adjudication**

To determine superiority, the Court considers:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of the class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

All four of these factors favor class treatment here. *First*, it would cost Class Members much more to litigate an individual case than they could recover in damages, as individual consumers stand to recover (at best) $2,500 in liquidated damages under the VPPA. *See, e.g.*, *Zaklit v. Nationstar Mortg. LLC*, 2017 WL 3174901, at *10 (C.D. Cal. 2017) ("[T]he Court is not persuaded that $5,000 in [statutory] damages is so clearly sufficient to motivate individual litigation involving complex factual and legal issues as to weigh against class certification"). Thus, when as here, "proceeding individually would be prohibitive for class members with small claims … the class action device is frequently superior to individual actions." *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010); *see also Goldemberg*, 317 F.R.D. at 397 ("Consumer class actions of this variety, designed to recover relatively small price premiums in comparison to the expense and burden of litigation, are clearly superior to the alternative of forcing consumers to

litigate on principle."). *Second*, no prior cases have been commenced against Defendant for similar causes of action. *See* Kopel Decl. ¶ 7. *Third*, "there is no reason why the litigation should not be concentrated in this forum." *EZ Seed*, 304 F.R.D. at 415. *Finally*, this case is manageable as a class action because liability will be established predominantly through common classwide proof. *See id.* ("[A]ny concerns about manageability rely, almost entirely, on a premise the Court has already rejected—namely, that innumerable individualized inquiries will swallow common ones.") (cleaned up).

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court grant their motion to certify the Class, appoint Plaintiffs as representatives of the Class, and appoint Yitzchak Kopel, Max S. Roberts, and Victoria X. Zhou of Bursor & Fisher, P.A. as class counsel.

Dated: April 17, 2026

Respectfully submitted,

By: */s/ Yitzchak Kopel*
Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Proposed Class Counsel*

**WORD COUNT CERTIFICATION**

I, Yitzchak Kopel, certify that I prepared this memorandum of law and that this memorandum complies with Local Rule 7.1(c) and Rule 4(B) of this Court's Individual Rules of Practice in Civil Cases. According to the word count processor used to prepare this document, this memorandum contains 6974 words.

Dated: April 17, 2026

By: */s/ Yitzchak Kopel*
Yitzchak Kopel